EXECUTION COPY



**LOAN AGREEMENT**

**By**

**BROUGHER, INC.**

**and**

**TBK BANK, SSB,**

**$10,400,000 Revolving Credit Facility**
**and**
**$2,650,000 Term Loan**

**Dated as of**

**March 4, 2016**

Exhibit "A"

**TABLE OF CONTENTS**

**Page**

ARTICLE I       GENERAL TERMS........................................................................ 1

    Section 1.01      Terms Defined Above................................................ 1

    Section 1.02      Certain Definitions.................................................... 1

    Section 1.03      Accounting Principles ............................................. 11

ARTICLE II      AMOUNT AND TERMS OF LOAN ........................................... 11

    Section 2.01      The Loans and Commitment................................... 11

    Section 2.02      Interest Rate .......................................................... 13

    Section 2.03      Notice and Manner of Revolving Credit Borrowing ........................ 13

    Section 2.04      Application of Cash Sums ...................................... 14

    Section 2.05      Computation.......................................................... 14

    Section 2.06      Voluntary Prepayments and Reborrowings ....................... 14

    Section 2.07      Mandatory Prepayments ........................................ 14

    Section 2.08      Cross-collateralization and Default ....................... 15

    Section 2.09      Refusal to Make Revolving Advances................... 15

    Section 2.10      Operating Accounts ............................................... 15

    Section 2.11      Cash Collateral Blocked Accounts ....................... 15

    Section 2.12      Collection of Accounts .......................................... 15

    Section 2.13      Termination of Commitment; Prepayment in Full............................ 16

    Section 2.14      Unused Line Fee ................................................... 16

    Section 2.15      Closing Fee ........................................................... 16

ARTICLE III     COLLATERAL ............................................................................ 16

    Section 3.01      Grant of Security Interest...................................... 16

    Section 3.02      Nature of Security Interest .................................... 16

    Section 3.03      Collateral Representations, Warranties and Covenants..................... 17

ARTICLE IV     REPRESENTATIONS AND WARRANTIES........................... 19

    Section 4.01      Corporate Existence.............................................. 19

    Section 4.02      Corporate Power and Authorization ..................... 19

    Section 4.03      Binding Obligations............................................... 20

    Section 4.04      Financial Condition................................................ 20

i

Section 4.05          Investments and Guaranties ............................................................. 20

Section 4.06          Ownership ....................................................................................... 20

Section 4.07          Liabilities ........................................................................................ 20

Section 4.08          Taxes; Governmental Charges ....................................................... 21

Section 4.09          Titles, etc ........................................................................................ 21

Section 4.10          Defaults ........................................................................................... 21

Section 4.11          Use of Proceeds; Margin Stock ..................................................... 21

Section 4.12          Compliance with the Law ............................................................... 21

Section 4.13          ERISA ............................................................................................. 22

Section 4.14          Subsidiaries .................................................................................... 22

Section 4.15          Direct Benefit From Loans ............................................................. 22

Section 4.16          NO PRIMING LOANS .................................................................... 22

Section 4.17          Leases and Landlord Waivers ........................................................ 22

Section 4.18          Patents, Trademarks, Copyrights and Licenses ............................ 22

Section 4.19          Priority of Liens .............................................................................. 22

Section 4.20          Continuous Nature of Representations and Warranties ................... 22

ARTICLE V          AFFIRMATIVE COVENANTS ........................................................ 23

Section 5.01          Financial Statements and Reports ................................................... 23

Section 5.02          Compliance with Laws; Payment of Taxes and Other Claims .......... 24

Section 5.03          Maintenance .................................................................................... 24

Section 5.04          Further Assurances ......................................................................... 25

Section 5.05          Reimbursement of Expenses ........................................................... 25

Section 5.06          Insurance ......................................................................................... 25

Section 5.07          Right of Inspection.......................................................................... 26

Section 5.08          Notice of Certain Events ................................................................. 26

Section 5.09          ERISA Information and Compliance ............................................... 26

Section 5.10          Environmental Requirements.......................................................... 27

Section 5.11          Additional Guarantors ..................................................................... 27

Section 5.12          Compliance Certificate ................................................................... 27

Section 5.13          Blocked Accounts ........................................................................... 27

Section 5.14          Subordinated Debt Legend and Inspection ..................................... 27

Section 5.15          Appraisals ....................................................................................... 27

Section 5.16       Post-Closing ............................................................... 27

ARTICLE VI       NEGATIVE COVENANTS .......................................... 28

Section 6.01       Debts, Guaranties and Other Obligations ......................... 28

Section 6.02       Liens................................................................................ 28

Section 6.03       Investments, Loans and Advances .................................... 29

Section 6.04       Dividends, Distributions and Redemptions ..................... 29

Section 6.05       Sale of Assets ................................................................. 29

Section 6.06       Limitation on Leases ...................................................... 30

Section 6.07       Corporate Change ........................................................... 30

Section 6.08       ERISA Compliance ........................................................ 30

Section 6.09       Issuance of Stock and Interests....................................... 30

Section 6.10       Changes in Accounting Methods ..................................... 30

Section 6.11       Transactions With Affiliates ........................................... 30

Section 6.12       Use of Proceeds.............................................................. 30

Section 6.13       [Reserved] ...................................................................... 31

Section 6.14       [Reserved] ...................................................................... 31

Section 6.15       Ratio of Senior Debt to Tangible Net Worth .................. 31

Section 6.16       [Reserved] ...................................................................... 31

Section 6.17       Senior Debt Payment Coverage Ratio ............................. 31

Section 6.18       Tangible Net Worth ........................................................ 32

Section 6.19       Restricted Payments........................................................ 33

Section 6.20       Subordinated Loan Documents........................................ 33

ARTICLE VII       EVENTS OF DEFAULT .............................................. 33

Section 7.01       Events.............................................................................. 33

Section 7.02       Remedies......................................................................... 35

Section 7.03       Prohibition of Transfer, Assignment and Assumption ..... 36

Section 7.04       Right of Setoff ................................................................ 36

ARTICLE VIII       CONDITIONS ........................................................... 36

Section 8.01       Closing ........................................................................... 37

Section 8.02       Officer's Certificate ....................................................... 37

Section 8.03       Secretary's Certificate.................................................... 37

Section 8.04       Opinion of Borrower's Counsel...................................... 37

Section 8.05    Counsel of Lender ........................................................................... 37

Section 8.06    No Default ...................................................................................... 37

Section 8.07    No Material Adverse Changes ......................................................... 37

Section 8.08    Guaranties ...................................................................................... 37

Section 8.09    Recordings ...................................................................................... 38

Section 8.10    Landlord and Mortgagee Waivers ................................................... 38

Section 8.11    Closing Fee ..................................................................................... 38

Section 8.12    Financial Condition ......................................................................... 38

Section 8.13    Additional Matters .......................................................................... 38

Section 8.14    Revolving Credit Advances ............................................................. 38

Section 8.15    No Litigation ................................................................................... 38

Section 8.16    Excess Availability Requirement ..................................................... 39

Section 8.17    Background Check ........................................................................... 39

Section 8.18    Blocked Accounts ........................................................................... 39

Section 8.19    Payoff Letter ................................................................................... 39

Section 8.20    Insurance ........................................................................................ 39

Section 8.21    Subordination Agreements .............................................................. 39

Section 8.22    Tax Information Authorization ........................................................ 39

Section 8.23    Other Loan Documents and Real Estate Matters .............................. 39

ARTICLE IX    MISCELLANEOUS ........................................................................ 40

Section 9.01    Notices ............................................................................................ 40

Section 9.02    Deviation from Covenants ............................................................... 40

Section 9.03    Invalidity ........................................................................................ 41

Section 9.04    Survival of Agreements ................................................................... 41

Section 9.05    Successors and Assigns .................................................................... 41

Section 9.06    Renewal, Extension or Rearrangement ............................................. 41

Section 9.07    Amendment and Waiver .................................................................. 42

Section 9.08    Cumulative Rights ........................................................................... 42

Section 9.09    Construction .................................................................................... 42

Section 9.10    Interest ............................................................................................ 42

Section 9.11    Multiple Originals ........................................................................... 42

Section 9.12    Exhibits and Schedules .................................................................... 43

iv

Exhibit "A"

Section 9.13     No Triparty Loan ........................................................................... 43

Section 9.14     Applicable Rate Ceiling ................................................................... 43

Section 9.15     Choice of Law, Venue and Jurisdiction ........................................... 43

Section 9.16     Negotiation of Documents ................................................................ 43

Section 9.17     Notices Received by Lender ............................................................. 43

Section 9.18     Debtor-Creditor Relationship .......................................................... 43

Section 9.19     No Third-Party Beneficiaries ........................................................... 43

Section 9.20     Indemnification ................................................................................ 44

Section 9.21     Release Of Liability ........................................................................ 44

Section 9.22     WAIVER OF TRIAL BY JURY ...................................................... 45

Section 9.23     DTPA Waiver .................................................................................. 45

Section 9.24     Final Expression .............................................................................. 46

Section 9.25     Reversal of Payments....................................................................... 46

Section 9.26     Injunctive Relief .............................................................................. 46

Section 9.27     Confidentiality ................................................................................. 46

# LOAN AGREEMENT

This LOAN AGREEMENT is made and entered into as of March 4, 2016 by **BROUGHER, INC.**, a Texas corporation ("Borrower") and **TBK BANK, SSB** ("Lender") with offices at 3 Park Central, Suite 1700, 12700 Park Central Drive, Dallas, Texas 75251.

# W I T N E S E T H :

For and in consideration of the mutual covenants and agreements herein contained and of the loans and commitments hereinafter referred to, Borrower and Lender agree as follows:

# ARTICLE I
# GENERAL TERMS

**Section 1.01     Terms Defined Above**.  As used in this Agreement, the terms "Borrower" and "Lender" shall have the meanings indicated above.

**Section 1.02     Certain Definitions**.  As used in this Agreement, the following terms shall have the following meanings, unless the context otherwise requires:

"Acceptable Forums" shall have the meaning set forth in Section 9.15 hereof.

"Account Agings" shall have the meaning set forth in Section 5.01(d) hereof.

"Accounts" shall mean any and all of Borrower's present and future: (a) accounts (as defined in the UCC); (b) instruments, documents, chattel paper (including electronic chattel paper) (all as defined in the UCC); (c) unpaid seller's or lessor's rights (including rescission, replevin, reclamation, repossession and stoppage in transit) relating to the foregoing or arising therefrom; (d) rights to any goods represented by any of the foregoing, including rights to returned, reclaimed or repossessed goods; (e) reserves and credit balances arising in connection with or pursuant to this Agreement; (f) guaranties, other supporting obligations, payment intangibles and letter of credit rights (all as defined in the UCC); (g) insurance policies or rights relating to any of the foregoing; (h) general intangibles pertaining to any of the foregoing (including rights to payment, including those arising in connection with bank and non-bank credit cards), and all books and records and any electronic media and software relating thereto; (i) notes, deposits or other property of Borrower's account debtors securing the obligations owed by such account debtors to Borrower; and (j) all Proceeds of any of the foregoing.

"Accounts Advance Amount" shall mean at any time an amount equal to the product of (a) all Eligible Accounts (as set forth in the most recently delivered Borrowing Base Certificate approved by Agent) times (b) a percentage, which shall initially be up to eighty-five percent (85%).  Lender shall have the right at any time, and from time to time, in its sole discretion, to revise the above-described percentage if Dilution at any time exceeds five percent (5%).

"Advances" shall mean, collectively, the Revolving Advances and the Term Loan.

"Affiliate" shall mean any Person controlling, controlled by or under common control with any other Person.  For purposes of this definition, "control" (including "controlled by" and

1

Exhibit "A"

"under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or otherwise.  Without limiting the generality of the foregoing, for purposes of this Agreement, Borrower, each Guarantor, if any, and each of Borrower's Subsidiaries, if any, shall be deemed to be Affiliates of one another.

"Agreement" shall mean this Loan Agreement, as the same may from time to time be amended, supplemented, restated or otherwise modified from time to time.

"Availability Block" shall mean an amount equal to One Million Five Hundred Thousand and No/100 Dollars ($1,500,000.00), provided that such amount shall automatically reduce to Zero and No/100 Dollars ($0.00) upon the earlier of: (i) the refinancing in full of the Term Loan (provided that, in the case of any refinancing of the Term Loan with the proceeds of a real estate loan in an aggregate principal amount of at least $3,710,000.00), provided that such Indebtedness (and the lender thereof) shall be acceptable to Lender (it being understood and agreed that the Lender shall be permitted to withhold its consent if such Person does not agree to provide Lender with access rights in respect of the Real Estate determined by Lender to be reasonably necessary); or (ii) receipt by the Borrower in immediately available funds of at least Two Million and No/100 Dollars ($2,000,000.00) in gross proceeds from an equity investment and/or mezzanine loan to the Borrower (which equity investment and/or mezzanine loan shall be in the form of common equity or another equity investment or mezzanine loan on terms (including the subordination thereof) reasonably acceptable to Lender (it being understood and agreed that the Lender shall be permitted to withhold its consent if any such other equity investment includes "put" rights, mandatory redemption rights, or similar rights prior to the then latest maturity date of the Term Loans and the Revolving Credit Facility).

"Availability Reserves" shall mean the sum, without duplication, of (i) such amounts, as of any date of determination, as Lender may from time to time establish and revise in the exercise of its sole discretion; and (ii) an approximate three-month reserve for the monthly principal and interest payments to become due and owing with respect to the Term Loan in an amount equal to no less than One Hundred Thousand and No/100 Dollars ($100,000.00) (the "P&I Term Loan Reserve") (it being understood that such P&I Term Loan Reserve will be implemented on the Closing Date), in each case reducing the amount of the Revolving Credit Facility which would otherwise be available to Borrower under the lending formula(s) provided for herein.

"Blocked Accounts" shall have the meaning set forth in Section 2.11 hereof.

"Borrower" shall have the meaning set forth in the preamble hereof.

"Borrowing Base" shall mean, at any time, an amount not to exceed the lesser of:  (a) Ten Million Four Hundred Thousand and No/100 Dollars ($10,400,000), and (b) the sum of (i) the Accounts Advance Amount determined as of the date the Borrowing Base is calculated plus (ii) the Inventory Advance Amount determined as of the date the Borrowing Base is calculated plus (iii) the Net M&E Advance Amount determined as of the date the Borrowing Base is calculated minus, in each case, any Availability Reserves and the Availability Block.

"Borrowing Base Certificate" shall mean a borrowing base report delivered under Section 5.1(g) or (h).

"Brookshire Deed of Trust" shall mean that certain Deed of Trust, dated as of March 4, 2016, granting a perfected, first priority Lien or security interest to Lender in certain Real Estate of Borrower located in Brookshire, Texas.

"Brougher Holdings" shall mean Brougher Holdings, LLC, a Texas limited liability company.

"Business Day" shall mean any day other than a Saturday, Sunday or other day on which the Federal Reserve Bank of New York (or any successor) or Lender is closed.

"Capital Expenditures" shall mean expenditures made or liabilities incurred for the acquisition of any fixed assets or improvements, replacements, substitutions or additions thereto which have a useful life of more than one (1) year, including the total principal portion of Capitalized Lease Obligations, which, in accordance with GAAP, would be classified as capital expenditures.

"Capitalized Lease Obligation" shall mean any Indebtedness of Borrower or any Subsidiary represented by obligations under a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Change of Control" shall mean either: (i) Brougher Holdings fails to own and control directly or indirectly sixty five percent (65%) of the voting power of Borrower, or (ii) Wade Brougher and Jerry Brougher, collectively, fail to own and control directly or indirectly more than fifty and one-tenth of one percent (50.1%) of the voting power of the Borrower, provided, however, with respect to any sale or transfer of any Stock of Borrower to any Person who does not own stock of Borrower on the Closing Date whereby such Person (and its Affiliates, if applicable) acquire in a single transaction or a series of transactions twenty percent (20%) or more of the Stock of Borrower, before any such sale or transfer may be made, Borrower must give three (3) Business Days' prior written notice to Lender identifying the name of such Person (and its Affiliates, if applicable) and such other information required by Lender to enable Lender to run its Office of Foreign Asset Control ("OFAC") searches; provided, further, that such sale or transfer may only be made if the OFAC searches are satisfactory to Lender.

"Chattel Paper" shall mean all present and hereafter acquired chattel paper (as defined in the UCC) and all Proceeds thereof.

"Closing Date" shall have the meaning set forth in Section 8.01 hereof.

"Closing Fee" shall have the meaning set forth in Section 2.15 hereof.

"Collateral" shall mean all assets of Borrower, including without limitation, all present and future Accounts, Chattel Paper, Deposit Accounts, Instruments, Documents, Letter of Credit Rights, Commercial Tort Claims, Equipment, Inventory and other Goods, General Intangibles, Investment Property, Real Estate, and any life insurance policies, cash and cash equivalents, books and records and all substitutions, replacements, products and proceeds of any of the foregoing; provided, however, that the Collateral shall exclude (i) any assets of Borrower to the extent that Borrower and Lender reasonably determine in good faith that the costs of obtaining a security interest therein are excessive in relation to the value of the security to be afforded thereby and (ii) that certain Equipment previously disclosed by Borrower to Lender which, on the Closing Date, is subject to purchase money security interests or

[Brougher] Loan Agreement
46475-0047
DA\400319979.12

**Exhibit "A"**

capital lease arrangements that prohibit the grant of a security interest in such Equipment (for so long as such prohibition exists).

"Commercial Tort Claims" shall mean all present and hereafter acquired commercial tort claims (as defined in the UCC) and all Proceeds thereof.

"Commitment" shall mean the obligation of Lender to make the Revolving Credit Facility and the Term Loan to Borrower under Section 2.01 hereof, up to the maximum amount therein stated.

"Compliance Certificate" shall mean a certificate of Borrower signed by an authorized officer of Borrower, containing the information required by Section 5.12 hereof.

"Default" shall mean the occurrence of any of the events specified in Article VII hereof, whether or not any requirement for notice or lapse of time or other condition precedent has been satisfied.

"Deposit Accounts" shall mean all present and hereafter acquired deposit accounts (as defined in the UCC) and all Proceeds thereof.

"Dilution" means, as of any date of determination, based upon the average of the immediately prior twelve month period or such other period as determined by Agent, a percentage that is the result of dividing the dollar amount of (a) bad debt write-downs, discounts, advertising allowances, credits, deductions, or other dilutive items as determined by Lender with respect to Borrower's Accounts, by (b) Borrower's billings with respect to Accounts.

"Distribution" by any Person shall mean (a) with respect to any Stock issued by such Person, the retirement, redemption, purchase or other acquisition for value of any such Stock, (b) the declaration or payment of any dividend or other distribution on or with respect to such Stock, (c) any loan or advance by such Person to, or other investment by such Person in, the holder of any such Stock and (d) any other payment by such Person to or for the benefit of the holder of any such Stock; provided, however, that notwithstanding the foregoing, the following shall not constitute Distributions: (i) loans or advances permitted under Section 6.03 and (ii) payments and repayments of Subordinated Debt which are permitted under the terms of the applicable Subordination Agreement (it being understood and agreed that no payments with respect to any Subordinated Debt are permitted under any Subordination Agreement as of the Closing Date).

"Documents" shall mean all present and future documents (as defined in the UCC), and any and all warehouse receipts, bills of lading, shipping documents, chattel paper, instruments and similar documents, all whether negotiable or non-negotiable, together with all Inventory and other Goods relating thereto, and all Proceeds of any of the foregoing.

"Drawdown Termination Date" shall mean March 4, 2019 or such later date, if this Agreement is extended pursuant to Section 2.01 hereof.

"DTPA" shall mean the Texas Deceptive Trade Practices Consumer Protection Act, Subchapter E of Chapter 17 of the Texas Business and Commerce Code.

Exhibit "A"

"Earnings Before Interest and Taxes" shall mean for any period the sum of (i) Net Income (or loss) of Borrower and its Subsidiaries, if any, on a consolidated basis for such period (excluding extraordinary gains and losses), plus (ii) all interest expense of Borrower and its Subsidiaries, if any, on a consolidated basis for such period, plus (iii) all charges against income of Borrower and its Subsidiaries on a consolidated basis for such period for federal, state and local taxes.

"EBITDA" shall mean for any period the sum of (i) Earnings Before Interest and Taxes for such period plus (ii) depreciation expenses of Borrower and its Subsidiaries, if any, on a consolidated basis for such period, plus (iii) amortization expenses of Borrower and its Subsidiaries, if any, on a consolidated basis for such period.

"Eligible Accounts" shall mean at any time an amount equal to the aggregate net invoice or ledger amount owing on all trade accounts receivable of Borrower for goods sold or leased or services rendered, in which Lender has a perfected, first-priority Lien or security interest. Eligible Accounts shall not include, without limitation: (a) the amount of all accounts receivables unpaid for ninety (90) days or more after the date of the original invoice unless Lender, in its sole discretion and after notice to Borrower, extends such ninety (90) days to one-hundred twenty (120) days for certain account debtors; (b) all such accounts receivable for which twenty-five percent (25%) or more of the outstanding aggregate balance owed by any account debtor is unpaid for ninety (90) days or more from the date of the original invoice (unless Lender, in its sole discretion and after notice to Borrower, extends such ninety (90) days to one-hundred twenty (120) days for certain account debtors); (c) the amount owed by any account debtor that exceeds thirty percent (30%) of all Eligible Accounts; (d) all contra-accounts receivable, credit offsets, setoffs, defenses or counterclaims asserted by or available to the Persons obligated on such accounts; (e) accounts receivable of the United States or any agency or department thereof for which Borrower has not complied with the Federal Assignment of Claims Act; (f) the amount owed by any account debtor that is a foreign entity; (g) all accounts receivable owed by account debtors which are bill and hold, pre-bill, credit card, cash-on-delivery or progress billing; (h) all such accounts receivable owing by officers or employees of Borrower or by Affiliates of Borrower; (i) the amount of all discounts, allowances, rebates, credits and adjustments to such accounts receivable; and (j) all such accounts owed by account debtors which are insolvent, in any bankruptcy proceeding, or otherwise which Lender, in its sole discretion, deems not acceptable. Eligible Accounts shall include (or not include) any account which Lender deems, in its sole discretion, to be (or not to be) an Eligible Account. Standards of eligibility and concentration limits may be revised at any time, and from time to time solely by Lender in its sole discretion.

"Eligible Equipment" shall mean an amount equal to the Net Orderly Liquidation Value of all of the Borrower's Equipment that was subject to the net orderly liquidation value appraisal conducted by Lender on or prior to the Closing Date, and in which the Lender has a perfected, first priority Lien or security interest.

"Eligible Inventory" shall mean an amount equal to the value of all of the Borrower's Inventory consisting of: (i) raw materials or (ii) finished goods, in each case, in respect of which the Lender has a perfected, first-priority Lien or security interest. Eligible Inventory shall not include, without limitation, Inventory: (a) consigned to or from third parties, (b) that is slow-moving, obsolete, unserviceable, damaged or spoiled, (c) comprised of packaging and shipping supplies, materials, boxes or containers, (d) that is used, returned, rejected, damaged or defective, (e) located outside of the continental United States, (f) that is in-transit, (g) work-in-process, (h)

5

raw materials that required reworking or were classified as "rejects", (i) scrap metal waste which is not usable as raw materials, or (j) goods which Lender, in its sole discretion, deems not acceptable.  Standards of eligibility may be revised at any time, and from time to time, solely by Lender in its sole discretion.

"Environmental Laws" shall mean all federal, state and local laws, rules, regulations, ordinances, programs, permits, guidances, orders and consent decrees relating to health, safety or environmental matters.

"Equipment" shall mean all present and hereafter acquired equipment (as defined in the UCC) including, without limitation, all machinery, equipment, rolling stock, furnishings and fixtures, and all additions, substitutions and replacements thereof, wherever located, together with all attachments, components, parts, equipment, auxiliary parts and accessories installed thereon or affixed thereto, whether the same constitutes personal property or fixtures and whether the interest therein is as owner, lessee or conditional vendee and all Proceeds of any of the foregoing.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"Event of Default" shall mean the occurrence of any of the events specified in Article VII hereof, provided that any requirement for notice or lapse of time or any other condition precedent has been satisfied.

"Financial Statements" shall mean the consolidated and consolidating financial statement or statements of Borrower and its Subsidiaries, if any, described or referred to in Section 4.04 hereof.

"GAAP" shall mean Generally Accepted Accounting Principles in effect in the United States applied on a consistent basis.

"General Intangibles" shall mean all present and hereafter acquired general intangibles (as defined in the UCC), and shall include, without limitation, all present and future right, title and interest in and to: (a) all trademarks, (b) patents, utility models, industrial models, and designs, (c) copyrights, (d) trade secrets, (e) licenses, permits and franchises, (f) any other forms of intellectual property, (g) all customer lists, distribution agreements, supply agreements, blueprints, indemnification rights and tax refunds, (h) all monies and claims for monies now or hereafter due and payable in connection with the foregoing, including, without limitation, payments for infringement and royalties arising from any licensing agreement between Borrower and any licensee of any of Borrower's General Intangibles, and (i) all Proceeds of any of the foregoing.

"Goods" shall mean all present and hereafter acquired goods (as defined in the UCC) and all Proceeds thereof.

"Guaranty Agreement" shall mean all Guaranty Agreements executed by Guarantors in favor of Lender (as the same may be amended, modified, supplemented or restated from time to time).

"Guarantors" shall mean any Person that at any time executes a Guaranty Agreement, which as of the Closing Date is Wade Brougher.

6

"Indebtedness" of a Person at a particular date shall mean all obligations of such Person which in accordance with GAAP would be classified upon a balance sheet as liabilities (except capital stock and surplus earned or otherwise) and in any event, without limitation by reason of enumeration, shall include all indebtedness, debt and other similar monetary obligations of such Person whether direct or guaranteed, and all premiums, if any, due at the required prepayment dates of such indebtedness, and  all indebtedness secured by a Lien on assets owned by such Person, whether or not such indebtedness actually shall have been created, assumed or incurred by such Person.  Any indebtedness of such Person resulting from the acquisition by such Person of any assets subject to any Lien shall be deemed, for the purposes hereof, to be the equivalent of the creation, assumption and incurring of the indebtedness secured thereby, whether or not actually so created, assumed or incurred.

"Indemnified Party" shall have the meaning set forth in Section 9.20 hereof.

"Instruments" shall mean all present and hereafter acquired instruments (as defined in the UCC) and all Proceeds thereof.

"Inventory" shall mean all present and hereafter acquired inventory (as defined in the UCC) including, without limitation, any goods held by Borrower for sale in the ordinary course of Borrower's business which includes goods purchased for resale.

"Inventory Advance Amount" shall mean at any time an amount equal to the sum of: (i) fifty percent (50%) of Eligible Inventory (as set forth in the most recently delivered Borrowing Base Certificate as approved by Agent) consisting of raw materials, plus (ii) fifty percent (50%) of Eligible Inventory (as set forth in the most recently delivered Borrowing Base Certificate as approved by Agent) consisting of finished goods, in each case, valued at the lower of cost or current market value.  Notwithstanding the foregoing, in no event shall the total Inventory Advance Amount at any time exceed One Million and No/100 Dollars ($1,000,000.00).  Lender shall have the right at any time, and from time to time, in its sole discretion, to revise the above-described percentages.

"Investment Property" shall mean all present and hereafter acquired investment property (as defined in the UCC) together with all stock and other equity interests in Borrower's Subsidiaries, and all Proceeds thereof.

"Lease(s)" shall have the meaning set forth in Section 4.17 hereof.

"Lender" shall have the meaning set forth in the preamble hereof.

"Letter of Credit Rights" shall mean all present and hereafter acquired letter of credit rights (as defined in the UCC) and all Proceeds thereof.

"Lien" shall mean any interest in Property securing an obligation owed to, or a claim by, a Person other than the owner of the Property, whether such interest is based on the common law, statute or contract, and including but not limited to the security interest or lien arising from a mortgage, security agreement, deed of trust, assignment, collateral mortgage, chattel mortgage, encumbrance, pledge, conditional sale or trust receipt or a lease, consignment, bailment for security purposes or certificate of title lien.  The term "Lien" shall include reservations, exceptions, encroachments, easements, rights-of-way, covenants, conditions, restrictions, leases and other title exceptions and encumbrances affecting Property.  For the purposes of this

7

Agreement, Borrower or any Loan Party shall be deemed to be the owner of any Property which it has acquired or holds subject to a conditional sale agreement, financing lease or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person for security purposes.

"Loan Documents" shall mean this Agreement, each Subordination Agreement, mortgages and deeds of trust on any real property, any lien subordination agreements, and any and all other agreements, instruments and documents, including guaranties, pledges, powers of attorney, consents and all other writings heretofore, now or hereafter executed by Borrower and/or delivered to Lender in respect of the transactions contemplated by this Agreement (and shall include any amendment, restatement, renewal, supplement, ratification, confirmation, reaffirmation or other modification of any of the foregoing).

"Loan Party" shall mean, at each relevant time of determination, (i) Borrower, (ii) each Guarantor, and (iii) any other Person that is now or hereafter becomes a party to this Agreement as a "Borrower" or party to any other Loan Document as a grantor, pledgor, or otherwise in a similar capacity.

"Material Adverse Effect" shall have the meaning set forth in Section 4.04 hereof.

"Maximum Facility Amount" shall mean the maximum amount of the Revolving Credit Facility plus the Term Loan.

"Net Income" means, for any period, Borrower's after-tax net income for such period, decreased by the sum of any extraordinary, non-operating or non-cash income recorded by Borrower during such period, all as determined in accordance with GAAP.

"Net M&E Advance Amount" shall mean as of the Closing Date, the lesser of: (i) $5,400,000 or (ii) seventy five percent (75%) of the Net Orderly Liquidation Value of the Borrower's Eligible Equipment (as set forth in the most recently delivered Borrowing Base Certificate as approved by Agent) subject to an appraisal obtained by Lender on or prior to the Closing Date (the "Initial Net M&E Advance Amount"); provided, however, that the Initial Net M&E Advance Amount shall be decreased by $1/60^{th}$ at the end of each calendar month (i.e., as of May 1, 2016, the Net M&E Advance Amount shall be $5,310,000).

"Net Orderly Liquidation Value" means the dollar amount that is estimated to be recoverable in an orderly liquidation of Borrower's Equipment as set forth in the net orderly liquidation value appraisal obtained by Lender on or prior to the Closing Date.

"Obligations" means all loans, advances, debts, other Indebtedness, principal, interest, liabilities, liquidated damages, obligations, fees, charges, costs or expenses, lease payments, guarantees, covenants, and duties owing by Borrower to Lender of any kind and description whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including any debt, liability, or obligation from Borrower to any other Person that Lender may have obtained by assignment or otherwise, and further including all interest not paid when due and all expenses that Borrower is required to pay or reimburse by agreement, law or otherwise, guaranties of indebtedness and obligations acquired from third Persons, whether in connection with this or other transactions, and all amounts owing or to be owing by Borrower to any agent bank of Lender pursuant to any letter of credit agreement, overdraft agreement or other agreement or financial accommodation.

Exhibit "A"

"Operating Accounts" shall have the meaning set forth in Section 2.10 hereof.

"Permitted Liens" shall have the meaning set forth in Section 6.02 hereof.

"Person" shall mean any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, trust, trustee, unincorporated organization, government or any agency or political subdivision thereof, or any other form of entity.

"Plan" shall mean any Plan subject to Title IV of ERISA and maintained by Borrower or any Subsidiary, or any such plan to which Borrower or any Subsidiary is required to contribute on behalf of its employees.

"Prime Rate" means, on any Business Day, the U.S. prime rate as published in The Wall Street Journal's "Money Rates" table for such Business Day.  If multiple prime rates are quoted in such table, then the highest U.S. prime rate quoted therein shall be the prime rate.  In the event that a U.S. prime rate is not published in The Wall Street Journal's "Money Rates" table for any reason or The Wall Street Journal is not published that day in the United States of America for general distribution, Lender will choose a substitute U.S. prime rate, for purposes of calculating the interest rate applicable hereunder, which is based on comparable information, until such time as a prime rate is published in The Wall Street Journal's "Money Rates" table.  Each change in the Prime Rate shall become effective without notice to Borrower on the effective date of each such change.  In no event shall the Prime Rate be less than three and one-quarter of one percent (3.25%).

"Proceeds" shall have the meaning given to such term in the UCC, including, without limitation, all (a) payments or other proceeds from an insurance carrier with respect to any loss, casualty or damage to Collateral, and (b) payments received on account of any condemnation or other governmental taking of any Collateral.

"Property" shall mean any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

"Real Estate" shall mean the "Property" (as such term is defined in the Brookshire Deed of Trust.

"Receipts" shall have the meaning set forth in Section 2.12(a) hereof.

"Revolving Advances" shall have the meaning set forth in Section 2.01(a) hereof.

"Revolving Credit Facility" shall mean a revolving credit facility in a maximum principal amount at any time outstanding of up to Ten Million Four Hundred Thousand and No/100 Dollars ($10,400,000).

"Senior Debt" shall mean the outstanding principal amount of, and all other outstanding obligations of, all Indebtedness (excluding the Subordinated Debt) of the Borrower at any date of determination.

"Senior Debt Payments" shall mean and include all cash actually expended by Borrower to make (a) interest payments on any Advances hereunder, plus (b) payments for all fees, commissions and charges set forth herein and with respect to any Advances, plus (c) payments for

Capitalized Lease Obligations, plus (d) all payments with respect to any other Indebtedness for borrowed money other than the Subordinated Debt.

"Senior Debt Payment Coverage Ratio" shall mean and include, with respect to any fiscal period, the ratio of (a) EBITDA for such period minus unfinanced Capital Expenditures made during such period to (b) the aggregate amount of Senior Debt Payments during such fiscal period.

"Stock" shall mean all shares, options, warrants, general or limited partnership interests or other equivalents (regardless of how designated) of or in a corporation, partnership or equivalent entity, whether voting or non-voting, including common stock, preferred stock and any other "equity security" (as defined in Rule 3a11-1 of the General Rules and regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended).

"Subordinated Debt" shall mean the indebtedness, obligations and liabilities of Borrower owing to Subordinated Lenders which is subordinated in right of payment to payment of the Obligations pursuant to a Subordination Agreement (it being understood and agreed that the indebtedness of the Company owed to Jerry Brougher under that certain Loan Agreement, dated February 21, 2013 (as amended, restated, supplemented or otherwise modified) shall in any event constitute Subordinated Debt hereunder notwithstanding).

"Subordinated Lenders" shall mean each of (i) the shareholder notes owing from Borrower to Wade Brougher, Jerry Brougher or Blake Partners, L.P. in the combined principal amount, as of the Closing Date, of $2,249,212.49 and (ii) all other Persons whose rights in respect of Indebtedness owing from Borrower or any such Subsidiary is subordinated to the Obligations, in each case, pursuant to a Subordination Agreement.

"Subordination Agreement" means that certain Subordination Agreement, dated as of the date hereof, among the Borrower, the Lender and certain of the Subordinated Lenders, and any other subordination agreement entered into after the date hereof among the Borrower, the Lender and the holders of any Subordinated Debt which is acceptable to the Lender, in its sole discretion.

"Subsidiary" shall mean any corporation or other entity of which more than fifty percent (50%) of the issued and outstanding securities having ordinary voting power for the election of directors is owned or controlled, directly or indirectly, by Borrower and/or one or more of its Subsidiaries and/or one or more shareholders or interest holders of such Borrower. Unless the context otherwise requires, "Subsidiary" shall not include any Subsidiary that is also a Borrower.

"Tangible Net Worth" shall mean, at a particular date, (a) the aggregate amount of the sum of (x) all assets of Borrower as may be properly classified as such in accordance with GAAP consistently applied excluding such other assets as are properly classified as intangible assets under GAAP and (y) the Subordinated Debt, less (b) the aggregate amount of all liabilities of Borrower, excluding Subordinated Debt.

"Termination Date" means the date there are no Obligations outstanding under this Agreement or the other Loan Documents (other than contingent indemnification obligations for which no claim or demand has been made) and the Lender's commitments under the Revolving Credit Facility have been terminated.

Exhibit "A"

"Termination Fee" is an amount equal to (a) three percent (3%) of the Revolving Credit Facility on the date of such prepayment if the prepayment occurs on or after the Closing Date to and including the date immediately preceding the first anniversary of the Closing Date, (b) two percent (2%) of the Revolving Credit Facility on the date of such prepayment if the prepayment occurs on or after the first anniversary of the Closing Date but prior to the second anniversary of the Closing Date, and (c) one percent (1%) of the Revolving Credit Facility on the date of such prepayment if the prepayment occurs on or after the second anniversary of the Closing Date.

"Term Loan" shall mean the term loan made pursuant to Section 2.01(b) hereof.

"UCC" shall mean the Uniform Commercial Code as the same may be amended and in effect from time to time in the State of Texas.

**Section 1.03    Accounting Principles**.  Where the character or amount of any asset or liability or item of income or expense is required to be determined or any consolidation or other accounting computation is required to be made for the purposes of this Agreement, this shall be done in accordance with GAAP as in effect on the Closing Date, except where such principles are inconsistent with the explicit requirements of this Agreement.  Unless otherwise expressly provided herein, each accounting term used herein shall have the meaning given it under GAAP as in effect on the Closing Date.  All terms used in this Agreement that are defined in the UCC and which are not otherwise defined herein shall have the same meanings herein as set forth therein.

## ARTICLE II
## AMOUNT AND TERMS OF LOAN

**Section 2.01    The Loans and Commitment**.  Subject to the terms and conditions and relying on the representations and warranties contained in this Agreement, Lender may make the following loans to Borrower:

(a)    **Revolving Loans**.  Subject to the terms and conditions and relying on the representations and warranties contained in this Agreement, from the date of this Agreement through the Drawdown Termination Date, Lender shall make advances under the Revolving Credit Facility to Borrower from time to time on any Business Day, such advances to be disbursed in accordance with Lender's normal operating procedures in such amounts as Borrower may request up to the maximum amount hereinafter stated, and Borrower may make prepayments (as permitted or required in Sections 2.06 and 2.07 hereof), and reborrowings, in respect thereof; provided, however, that the aggregate principal amount of all such advances made under the Revolving Credit Facility (collectively the "Revolving Advances") at any one time outstanding shall not exceed the Borrowing Base.  The Revolving Credit Facility otherwise available to Borrower pursuant to the lending formulas and subject to the Borrowing Base and other applicable limits hereunder shall be subject to Lender's continuing right to establish and revise Availability Reserves.  The Obligations related to the Revolving Credit Facility shall be payable on the Drawdown Termination Date and are secured by all of the Collateral.  Thereafter, at the Borrower's request and in the sole discretion of Lender, the Drawdown Termination Date may be extended for a term of one (1) year.  At the expiration of such additional one (1) year term, in the event Borrower has not given Lender sixty (60) days' prior written notice of its intent to terminate the Revolving Credit Facility, then, at the sole discretion of Lender, the Revolving Credit Facility shall be renewed, and the Drawdown Termination Date extended, for a period of one (1) year; and at the end of such one (1) year extension, the Revolving Credit Facility may be

11

again extended, from year to year, in the same fashion. Each such extension shall be upon the same terms and conditions as set forth herein and the other Loan Documents relating to the same, and upon such further stipulations and conditions as Lender may require. Interest on the Revolving Credit Facility shall accrue and be payable as provided in Section 2.02 hereof.

(b)     **Term Loan**.     Subject to the terms and conditions and relying on the representations and warranties contained in this Agreement, on the date of this Agreement, Lender will make a single Term Loan to Borrower in the original principal amount equal to Two Million Six Hundred Fifty Thousand and No/100 Dollars ($2,650,000.00). The Term Loan shall be secured by all of the Collateral. The principal balance of the Term Loan shall be payable in equal monthly installments (which installments shall equal an amount necessary to amortize the principal balance of the Term Loan in equal monthly payments, over an assumed one hundred eighty (180) month period), commencing on May 1, 2016. Notwithstanding anything contained herein, the entire principal balance of the Term Loan, and all accrued interest thereon, shall be due and payable immediately upon the Drawdown Termination Date or otherwise upon maturity, acceleration and/or termination of the Revolving Credit Facility. Interest on the Term Loan shall accrue and be payable as provided in Section 2.02 hereof. Once the Term Loan is advanced, any amount repaid may not thereafter be reborrowed.

(c)     **Evidence of Loans**

(i)     Lender shall maintain, in accordance with its usual practice, electronic or written records evidencing the Obligations to Lender resulting from the Advances made by Lender from time to time, including without limitation, the amounts of principal and interest payable and paid to Lender from time to time under this Agreement. Copies of such records shall be available to the Borrower upon written request for same.

(ii)     The entries made in the electronic or written records maintained pursuant to subsection (b)(i) of this Section 2.01 (the "Register") shall be prima facie evidence of the existence and amounts of the Obligations therein recorded, absent manifest error; provided, however, that the failure of Lender to maintain such records or any error therein shall not in any manner affect the obligations of Borrower to repay the Advances or Obligations in accordance with their respective terms.

(iii)     Lender will account to Borrower monthly with a statement of Advances under the Revolving Credit Facility, Term Loan, and any charges and payments made pursuant to this Agreement, and in the absence of manifest error, such accounting rendered by Lender shall be deemed final, binding and conclusive unless Lender is notified by Borrower in writing to the contrary within fifteen (15) calendar days of receipt of such accounting, which notice shall be deemed an objection only to items specifically objected to therein.

(d)     **Promise to Pay**.     Borrower absolutely and unconditionally promises to pay principal, interest and all other Obligations payable hereunder, or under any other Loan Document, without any defense, right of rescission and without any deduction whatsoever, including any deduction for any setoff, counterclaim or recoupment, and notwithstanding any damage to, defects in or destruction of the Collateral or any other event, including obsolescence of any property or improvements.

       (e)    **Protective Advances**.  Lender may make a Revolving Advance for any reason at any time in its sole discretion, without Borrower's compliance with any of the conditions of this Agreement so long as the proceeds thereof are (i) disbursed directly to third Persons in order to protect Lender's interest in the Collateral or to perform any obligation of Borrower under this Agreement or otherwise to enhance the likelihood of repayment of the Obligations, or (ii) apply the proceeds to outstanding Obligations then due and payable.

       **Section 2.02**    **Interest Rate**.  The Advances shall bear interest at the following rates:

       (a)    The Advances shall bear interest from the date thereof until maturity at a varying rate of interest which is (i) for the Revolving Credit Facility, four percent (4.00%) above the Prime Rate, and (ii) for the Term Loan, five percent (5%) above the Prime Rate, in each case as the Prime Rate may change from day to day, calculated on the last day of each month (but in no event to exceed the applicable limits imposed by any applicable usury laws).

       (b)    Upon the occurrence of a Default or an Event of Default, principal and past due interest (to the extent permitted by law) in respect of the Revolving Credit Facility and the Term Loan shall bear interest at a rate which is two percent (2.0%) per annum in excess of the rate set forth in Section 2.02(a) hereinabove (but in no event to exceed the applicable limits imposed by any applicable usury laws) irrespective of whether the Obligations have been accelerated.

       (c)    Interest calculations are subject to certain recapture provisions set forth herein.

       (d)    Interest charges shall be paid monthly in arrears on the first Business Day of each calendar month.

       (e)    All reference to a rate of interest contained in this Agreement shall be based upon a per annum rate and calculated as set forth in Section 2.05.

       **Section 2.03**    **Notice and Manner of Revolving Credit Borrowing.**  The amount and date of each Revolving Advance shall be made as set forth in this Section 2.03.  Revolving Advances may be made by Lender (a) pursuant to the terms of any written agreement executed in connection herewith between Borrower and Lender, or (b) in Lender's sole discretion, at the oral or written request of Borrower or of any officer or agent of Borrower.  Borrower covenants and agrees to furnish to Lender written confirmation of any such oral request within five (5) days of the resulting Advance, but any such Advance shall be deemed to be made under and entitled to the benefits of the terms herein irrespective of any failure by Borrower to furnish such written confirmation.

       **Section 2.04**    **Application of Cash Sums**.  All cash sums paid to or received by Lender on account of any Collateral (a) shall be promptly applied by Lender on the Obligations whether or not such Obligations shall have, by their terms, matured, such application to be made to principal or interest or expenses as Lender may elect; provided, however, that, notwithstanding the foregoing, the Lender shall not make such application to the principal of the Term Loan unless such principal is then due and payable; provided, however, Lender need not give credit for any item included in such sums until two (2) Business Days after the final collection thereof; provided, further, however, Lender's failure to so apply any such sums shall not be a waiver of Lender's right to so apply such sums or any other sums at any time, or (b) prior to the happening of any Default or Event of Default, at the option of Lender, shall be released to Borrower for use in Borrower's business.

13

**Section 2.05** **Computation**. All payments of interest shall be computed on the per annum basis of a year of three hundred sixty (360) days and for the actual number of days (including the first but excluding the last day) elapsed unless such calculation would result in a usurious rate, in which case interest shall be calculated on a per annum basis of a year of three hundred sixty-five (365) or three hundred sixty-six (366) days, as the case may be.

**Section 2.06** **Voluntary Prepayments and Reborrowings**. The Borrower may, at any time and from time to time on any Business Day, prepay Advances (including protective advances made under Section 2.02(e)), in whole or in part, without premium or penalty (and, in respect of the Term Loan, applied to installments of principal and interest due and payable under the Term Loan as directed by the Borrower); provided, that if (x) the Revolving Advances are prepaid in full and (y) the Commitments under the Revolving Credit Facility are terminated in full, then the Termination Fee shall be required to be paid under Section 2.13. The unpaid principal balance of the Revolving Credit Facility at any time shall be the total amount of Revolving Advances loaned or advanced thereunder by Lender, less the amount of payments or prepayments of principal made thereon by or for the account of Borrower. It is contemplated that by reason of prepayments thereon there may be times when no Obligations are owing thereunder; but notwithstanding such occurrences, the other Loan Documents shall remain valid and be in full force and effect as to loans or Advances made pursuant to and under the terms of this Agreement subsequent to each such occurrence until the Termination Date.

**Section 2.07** **Mandatory Prepayments.**

(a) If at any time the outstanding principal balance under the Revolving Credit Facility exceeds the Borrowing Base, then Borrower shall forthwith prepay the amount of such excess for application towards reduction of the outstanding principal balance of the Revolving Credit Facility. Said prepayment shall be without premium or penalty, and shall be made together with the payment of accrued interest on the amount prepaid and shall be applied to reduce the outstanding principal balance of the Revolving Credit Facility.

(b) Concurrently with the receipt by the Borrower or any of its Subsidiaries which is a Loan Party of any net cash proceeds from any (i) asset disposition, (ii) issuance of Stock of the Borrower or any of its Subsidiaries which is a Loan Party (excluding (x) any issuance of Stock pursuant to any employee or director option program, benefit plan or compensation program and (y) any issuance by a Loan Party to any other Loan Party) or (iii) issuance of any debt securities (other than indebtedness permitted under Section 6.01) after the date hereof by any the Borrower or any of its Subsidiaries which is a Loan Party, such Loan Party shall forthwith prepay the Revolving Credit Facility in an amount equal to one hundred percent (100%) of such net cash proceeds received from clause (i), (ii) or (iii) described herein; provided, however, that notwithstanding the foregoing, one hundred percent (100%) of the net cash proceeds of any disposition of the Real Estate shall be required to be used to prepay the Term Loan (applied to installments of principal and interest due and payable under the Term Loan in the inverse order of maturity); provided, further that any prepayment of the Revolving Credit Facility under this Section 2.07(b) shall be subject to Section 2.13.

**Section 2.08** **Cross-collateralization and Default.** The other Loan Documents and any other instrument given in connection with, or as security for, the Obligations of Borrower or any Subsidiary, shall serve as security one for the other, and an event of default under any such instrument shall constitute an event of default under all such other instruments.

**Section 2.09** **Refusal to Make Revolving Advances.** Notwithstanding anything to the contrary contained herein or in any other instrument or agreement executed in connection with or as security for the Obligations, Lender may at any time, and from time to time, in its sole discretion, refuse to make any Revolving Advance if the conditions set forth in Section 8.14 have not been satisfied.

**Section 2.10** **Operating Accounts**. Attached hereto as Schedule 2.10 is a listing of all present operating accounts which are checking or other demand daily depository accounts maintained by Borrower (the "Operating Accounts"), together with the address of that depository, the account number(s) maintained with such depository, and a contact person at such depository.

**Section 2.11** **Cash Collateral Blocked Accounts**. Borrower and Lender shall establish with banks acceptable to Lender certain lockboxes and blocked accounts (collectively "Blocked Accounts") as set forth on Schedule 2.11 attached hereto, for the benefit of Lender, for the deposit of all receipts and collections in accordance with Section 2.12 hereof, pursuant to executed blocked account agreements in form and substance satisfactory to Lender, in its sole discretion. All receipts and collections deposited in such Blocked Accounts shall be pledged to Lender and forwarded on a daily basis to Lender's account at Independent Banker's Bank (or any successor or assign). Proceeds received from such Blocked Accounts shall be applied against the Obligations owing by Borrower to Lender and shall be applied in accordance with Section 2.04 hereof. Only Lender shall have the right to direct withdrawals from such Blocked Accounts. Each bank at which any such Blocked Account is maintained shall waive any right of offset such bank may otherwise have in such Blocked Account and the items deposited therein. Borrower shall pay all fees and charges as may be required by any depository in which such Blocked Accounts are opened. Borrower shall contemporaneously with the execution of this Agreement, provide Lender with the duly executed blocked account agreements related to such Blocked Accounts, and provide forwarding instructions to the relevant Blocked Accounts to the depositary bank in respect of any existing lockboxes.

**Section 2.12** **Collection of Accounts.**

(a) All receipts of cash, cash equivalents, checks, credit card receipts, notes, drafts, instruments, and other items of payment arising out of the sale of inventory or other Property of Borrower or the creation of accounts receivable, including without limitation, Proceeds and tax refunds (referred to as "Receipts"), and all Property of Borrower in which Lender has a security interest or Lien, shall be forwarded to or deposited daily into one or more of the Blocked Accounts, and shall be held in trust by Borrower for Lender until so deposited.

(b) In the event, notwithstanding the provisions of this Section 2.12, Borrower receives or otherwise has dominion and control of any Receipts, or any proceeds or collections of any Property of Borrower in which Lender has a security interest or Lien, such Receipts, proceeds, and collections shall be held in trust by Borrower for Lender and shall not be commingled with any of Borrower's other funds or deposited in any account of Borrower other than a Blocked Account.

**Section 2.13** **Termination of Commitment; Prepayment in Full**. In the event Borrower desires to terminate the Commitment or prepay in full the Revolving Credit Facility and the Term Loan at any time, Borrower will give Lender the following notice of such termination or prepayment: (i) with respect to the Revolving Credit Facility, at least sixty (60 days written notice; and (ii) with respect to the Term Loan, reasonable, advance written notice. Additionally, if (x) all of the Commitments under the Revolving Credit Facility are terminated and (y) the Revolving Advances are repaid or prepaid in full, Borrower will pay to Lender, as liquidated damages and not as a penalty, the Termination Fee. In the event Borrower's business is significantly changed as a result of a sale of assets not in the ordinary course

Exhibit "A"

of business, Borrower shall also pay the liquidated damages contemplated in this <u>Section 2.13</u>. For the avoidance of doubt, in no event will Borrower (x) prepay the Revolving Advances in full and (y) terminate the Commitments under the Revolving Credit Facility without also prepaying in full the Term Loan.

Section 2.14     <u>Unused Line Fee</u>.  Borrower shall pay to Lender on the first day of each month during the term of this Agreement a monthly unused line fee equal to the product of (a) one-half of one percent (0.50%) divided by 360 days; times (b) the average daily unused portion of the Revolving Credit Facility for the preceding month; times (c) the actual number of days lapsed during the preceding month.

Section 2.15     <u>Closing Fee</u>.  Borrower shall pay to Lender, a closing fee (the "<u>Closing Fee Fee</u>") at closing in the amount equal to one percent (1.00%) of the Maximum Facility Amount.  The Closing Fee shall be deemed fully earned and nonrefundable on the due date thereof.

<u>**ARTICLE III**</u>
<u>**COLLATERAL**</u>

Section 3.01     <u>Grant of Security Interest</u>.  As security for the prompt payment in full of all Obligations, the Borrower hereby pledges and grants to Lender a continuing Lien upon, and security interest in, all of the Collateral.  The security interests granted hereunder shall extend and attach to all Collateral which is presently in existence or hereafter acquired and which is owned by Borrower or in which Borrower has any interest, whether held by Borrower or by others for the Borrower's account, and wherever located.

Section 3.02     <u>Nature of Security Interest</u>.

(a)     The rights and security interests granted to Lender hereunder shall continue in full force and effect, notwithstanding the termination of this Agreement, until the Termination Date.  Any reserves or balances to the credit of Borrower, and any other property or assets of Borrower in the possession of Lender, to the extent constituting Collateral, may be applied by the Lender in whole or partial satisfaction of such Obligations when due, subject to the terms of this Agreement.  The Liens and security interests granted to Lender herein and any other Lien or security interest which Lender may have in any other assets of Borrower secure payment and performance of all present and future Obligations.

(b)     Notwithstanding Lender's security interests in the Collateral, to the extent that the Obligations are now or hereafter secured by any assets or property other than the Collateral, or by the guaranty, endorsement, assets or property of any other Person, Lender shall have the right in its sole discretion to determine which rights, security, liens, security interests or remedies Lender shall at any time pursue, foreclose upon, relinquish, subordinate, modify or take any other action with respect to, without in any way modifying or affecting any of such rights, security, liens, security interests or remedies, or any of Lender's rights under this Agreement.

Section 3.03     <u>Collateral Representations, Warranties and Covenants</u>.

(a)     <u>Generally.</u>  Borrower represents, warrants and agrees that: (a) upon the filing of UCC financing statements covering the Collateral in all required jurisdictions, this Agreement creates a valid, perfected and first priority security interest in all Collateral constituting personal property of Borrower as to which a security interest may be perfected by such filing, and the

security interests granted herein constitute and shall at all times constitute the first and only Liens on the Collateral except for Permitted Liens; (b) Borrower is, or will be at the time additional Collateral is acquired by Borrower, the absolute owner of the Collateral with full right to pledge, sell, transfer and create a security interest therein, free and clear of any and all claims or Liens in favor of others except for Permitted Liens; and (c) Borrower will, at its expense, forever warrant and, at Lender's reasonable request, defend the same from any and all claims and demands of any other Person with respect to the Collateral in excess of $50,000.

    (b)        **Agreements Regarding Accounts and Inventory**

        (i)        Borrower represents and warrants to Lender that: (i) each Account in respect of Inventory is, or will be when an additional Account in respect of Inventory is created, based on an actual and bona fide sale and delivery of Inventory or rendition of services to customers, made by Borrower in the ordinary course of its business; (ii) the invoices evidencing any such Accounts are and will at all times be in the name of Borrower; (iii) the customers of Borrower have accepted the Inventory or services, owe and are obligated to pay the full amounts stated in the invoices according to their terms, without dispute, offset, defense, counterclaim or contra, except for disputes and other matters arising in the ordinary course of business which Borrower has notified Lender as set forth herein; and (iv) Borrower's Inventory is and will at all times be marketable in ordinary course of Borrower's business, and no Inventory has been or will be produced in violation of the Fair Labor Standards Act (29 U.S.C. §201 et seq.), as amended.

        (ii)        Borrower agrees to issue credit memoranda promptly upon accepting returns or granting allowances and to deliver to Lender copies of such credit memoranda as and when required to do so herein.  In no event shall prior recourse to any Account or other security granted to or by Borrower be a prerequisite to Lender's right to demand payment of any of the Obligations.  In addition, Borrower agrees that Lender shall have no obligation whatsoever to perform in any respect any of Borrower's contracts or obligations relating to the Accounts.

        (iii)        Borrower agrees not to acquire any Inventory on a consignment basis (provided that Borrower shall be permitted to take possession of Inventory of another Person on a consignment basis, it being understood and agreed that such Inventory shall not constitute Eligible Inventory) , nor co-mingle its Inventory with any Goods of its customers or any other Person (whether pursuant to any bill and hold sale or otherwise) other than Inventory consigned to the Borrower in the ordinary course of its business. Borrower agrees to safeguard and protect all Inventory in a commercially reasonable manner consistent with its historical business practices and to hold all Inventory for Lender's account and to make no sale or other disposition thereof except in the ordinary course of its business, on open account and on commercially reasonable terms consistent with Borrower's past practices.  Notwithstanding the ordinary course of Borrower's business and Borrower's past practices, Borrower agrees not to sell Inventory on a consignment basis.  As to any such sale, transfer, lease or other disposition of Inventory, Lender shall have all of the rights of an unpaid seller, including stoppage in transit, replevin, rescission and reclamation. During the continuance of an Event of Default which has not been waived in accordance with this Agreement and on notice from Lender, Borrower agrees that all returned, reclaimed or repossessed merchandise or Goods shall be set aside by Borrower, marked with Lender's name (as secured party) and held by Borrower for Lender's account.

17

(c)   **Agreements Regarding Equipment**.   The Borrower shall use commercially reasonable efforts consistent with its historical business practices to (i) maintain the Equipment in good operating condition and repair (reasonable wear and tear excepted) and (ii) cause all necessary replacements of and repairs thereto to be made so that the value and operating efficiency of the Equipment shall be maintained and preserved.   Borrower shall not use or operate the Equipment in violation of any law, statute, ordinance, code, rule or regulation except as could not reasonably be expected to have a Material Adverse Effect.

(d)   **Agreements Regarding General Intangibles**.   Borrower represents and warrants to Lender that as of the date hereof, Borrower holds title to all General Intangibles necessary to conduct Borrower's business as presently conducted.   Borrower agrees to use commercially reasonable manner consistent with its historical business practices maintain Borrower's rights in, and the value of, all such General Intangibles, and to pay when due all payments required to maintain in effect any licensed rights.   Borrower shall provide Lender with adequate notice of the acquisition of rights with respect to any additional patents, trademarks and copyrights so that Lender may, to the extent permitted under the documentation granting such rights or applicable law, perfect its security interest in such rights in a timely manner.

(e)   **Commercial Tort Claims and Letter of Credit Rights**.   Borrower represents and warrants to Lender that as of the date hereof, Borrower holds no interest in any commercial tort claims.   Borrower is not the beneficiary of any letter of credit.   If Borrower at any time holds or acquires a commercial tort claim or becomes a beneficiary under any letter of credit, Borrower shall promptly notify Lender in writing thereof and shall execute such further documents or do such further acts as Lender may reasonably request to grant to Lender valid and perfected first priority security interests in such commercial tort claims and letters of credit, as the case may be.

(f)   **Real Estate**.   Borrower agrees to execute and deliver to Lender a mortgage or deed of trust (as appropriate) and the Brookshire Deed of Trust, each in form and substance satisfactory to Lender, on the Real Estate and any subsequent real estate owned or acquired by Borrower after the date hereof constituting Collateral, in order to permit the Lender to obtain a valid first-priority Lien thereon, subject to Permitted Liens.   Borrower agrees to maintain the Real Estate and all subsequent real estate acquired after the Closing Date and constituting Collateral in compliance with the Loan Documents pledging a security interest in such Collateral.   Upon the repayment in full of the Term Loan the security interest granted herein, in the Brookshire Deed of Trust or any other mortgage, deed of trust or other Loan Document in respect of the Real Estate or any other real property shall automatically be released (and the Lender agrees to take such actions as may be reasonably requested by Borrower, at Borrower's expense, to evidence such release).

(g)   **Further Assurances.**   Borrower agrees to comply with the requirements of all state and federal laws in order to grant to Lender valid and perfected first priority security interests in the Collateral; provided, however, that in no event shall Lender be entitled to perfect its security interests under the laws of any jurisdiction other than the United States or any State thereof (and Borrower shall not be required to comply with any foreign perfection requirements).   Lender is hereby authorized by Borrower to file from time to time any financing statements, continuations or amendments covering the Collateral without Borrower's signature in accordance with the provisions of the UCC.   Borrower hereby consents to and ratifies the filing of any financing statements covering the Collateral by Lender on or prior to the effective date of this Agreement. Borrower agrees to do whatever Lender may reasonably request, from time to time, by way of: (a) filing notices of liens, financing statements, amendments, renewals and

18

continuations thereof; (b) cooperating with Lender's agents and employees; (c) keeping Collateral records; (d) transferring proceeds of Collateral to Lender's possession in accordance with the terms hereof; (e) obtaining waivers from landlords, warehousemen, third party processors and mortgagees; and (f) performing such further acts as Lender may reasonably require in order to effect the purposes of this Agreement.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

In order to induce Lender to enter into this Agreement, Borrower represents and warrants on the Closing Date and on each date a Revolving Advance is made to Lender (which representations and warranties will survive the making of the loans hereunder) that:

**Section 4.01    Corporate Existence**.  Borrower and each other Loan Party is (x) duly existing and in good standing in its state of formation and (y) qualified and licensed to do business in, and in good standing (to the extent such concept is applicable) in, any state in which the conduct of its business or its ownership of property requires that it be qualified except, in the case of this clause (y), as could not reasonably be expected to result in a Material Adverse Effect.  Except as set forth on Schedule 4.01, neither Borrower nor any Loan Party (i) has been known as or used any corporate, fictitious or trade names or (ii) during the past five (5) years, has been the surviving corporation of a merger or consolidation or acquired all or substantially all of the assets of any Person (except as otherwise disclosed to Lender prior to the Closing Date).  The chief executive office of Borrower and Borrower's records concerning its accounts receivable are located only at the address set forth on Schedule 4.01 and its only other places of business and the only other locations of Collateral (together with the owners and/or operators thereof), if any, are the addresses set forth on Schedule 4.01, subject to the right of Borrower to establish new locations in accordance with the terms of this Agreement.

**Section 4.02    Corporate Power and Authorization**.  Borrower and each other Loan Party is duly authorized and empowered to execute, deliver and perform the Loan Documents, including without limitation, this Agreement, to which it is a party; and all action (corporate or otherwise) on Borrower's or any Loan Party's part requisite for the due execution, delivery and performance of the Loan Documents, including this Agreement, to which Borrower or any Loan Party is a party has been duly and effectively taken.  The Loan Documents, including, without limitation this Agreement, to which Borrower or any Loan Party is a party, (a) do and will not not (x) violate (i) any provisions of the articles of incorporation, bylaws or other governing documents of Borrower or any Loan Party, or (ii) any contract, agreement, law, regulation, order, injunction, judgment, decree or writ to which Borrower or any Loan Party is subject (except, in the case of any contract, as could not reasonably be expected to result in a Material Adverse Effect), or (y) result in the creation or imposition of any Lien upon any Properties of Borrower or any Loan Party, other than those contemplated by this Agreement and (b) do not require the consent or approval of any other Person or entity, including without limitation, any regulatory authority or governmental body of the United States, of any state or of any political subdivision of the United States or of any State except consents or approvals which have been obtained and are in full force and effect.

**Section 4.03    Binding Obligations**.  This Agreement does constitute, and the other Loan Documents to which Borrower or any Loan Party is a party upon their creation, issuance, execution and delivery will constitute, valid and binding obligations of Borrower or such other Loan Party, as the case may be, enforceable in accordance with their respective terms except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement

of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

Section 4.04    **Financial Condition**.   The unaudited, consolidated and consolidating, if applicable, financial statements of Borrower and its Subsidiaries, if any, dated January 31, 2016, which have been delivered to Lender are complete and correct, have been prepared from the books and records of Borrower in accordance with GAAP, consistently applied, and fully and accurately present the financial condition and results of the operations of Borrower and its Subsidiaries, if any, as at the date or dates and for the period or periods stated.   No material adverse change, either in any case or in the aggregate, has since occurred in the business, prospects, profits, Properties, operations or condition, financial or otherwise, of Borrower or any other Loan Party, except as disclosed to Lender in writing (a "Material Adverse Effect").

Section 4.05    **Investments and Guaranties**.  Neither Borrower nor any Subsidiary has made investments in, advances to or guaranties of the obligations of any Person, except as reflected in the Financial Statements to the extent required by GAAP.

Section 4.06    **Ownership**.  As of the Closing Date, the authorized capital Stock of Borrower and each of the other Loan Parties, and the number and ownership of all outstanding capital Stock of Borrower and each of the other Loan Parties is as set forth on Schedule 4.06 attached hereto.  There are no legal or equitable ownership interests, or any outstanding subscriptions, warrants, options, calls, commitments, convertible securities or other agreements to which Borrower or any other Loan Party is a party or by which it is bound, calling for the issuance of any ownership interests in capital Stock or securities convertible into capital Stock of Borrower or any other Loan Party, except as disclosed on Schedule 4.06.

Section 4.07    **Liabilities**.  Except for liabilities (a) incurred in the normal course of business, or (b) described in the Financial Statements, neither Borrower nor any other Loan Party has liabilities, direct or contingent, owing to any Person other than Lender.  Except as described in the Financial Statements, or as otherwise disclosed to Lender in writing, there is no litigation, legal or administrative proceeding, investigation or other action of any nature pending or, to the knowledge of Borrower or any other Loan Party, threatened against or affecting Borrower or any Subsidiary which involves the possibility of any judgment or liability not fully covered by insurance, and would reasonably be expected to result in a Material Adverse Effect.

Section 4.08    **Taxes; Governmental Charges**.  Borrower and each Subsidiary has filed all tax returns and reports required to be filed and has paid all taxes, assessments, fees and other governmental charges levied upon it (other than any which are not yet due and payable or the amount or validity of which is currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of Borrower or the relevant Subsidiary).

Section 4.09    **Titles, etc.**  Borrower and each Subsidiary has good and indefeasible title to the Eligible Accounts, Eligible Equipment and Eligible Inventory, and all other respective Properties which are material to its business, free and clear of all Liens except Permitted Liens.

Section 4.10    **Defaults**.  Neither Borrower nor any Subsidiary is in default under any indenture, mortgage, deed of trust, material agreement or other material instrument to which Borrower or any Subsidiary is a party or by which Borrower or any Subsidiary is bound, except as disclosed to Lender in writing.  No Default or Event of Default hereunder has occurred and is continuing.

20

**Section 4.11** **Use of Proceeds; Margin Stock**.  The proceeds of the Revolving Credit Facility and Term Loan will be used by Borrower (a) on the Closing Date to satisfy obligations incurred in connection with an existing secured credit facility and to satisfy other debt obligations approved by Lender, (b) for fees and expenses incurred in connection with the consummation of this Agreement and the transactions contemplated thereby, and (c) as working capital for Borrower's business.  None of such proceeds will be used for, and neither Borrower nor any Loan Party are engaged in the business of, extending credit for the purpose of purchasing or carrying any "margin stock" as defined in Regulation U of the Board of Governors of the Federal Reserve System (12 C.F.R. Part 221), or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase or carry a margin stock or for any other purpose which might constitute this transaction a "purpose credit" within the meaning of said Regulation U.  No part of the proceeds of the Revolving Credit Facility or Term Loan will be used for any purpose which violates Regulation X of the Board of Governors of the Federal Reserve System (12 C.F.R. Part 224).  All loans evidenced by this Agreement are and shall be "business loans" as such term is used in the Depository Institutions Deregulation and Monetary Control Act of 1980, as amended, and such loans are for business, commercial, investment or other similar purposes and not primarily for personal, family, household or agricultural use, as such terms are used and defined in Texas Revised Civil Statutes Annotated, Title 4 of the Finance Code, Chapter 346.  Neither Borrower nor any Loan Party nor any Person acting on behalf of Borrower or any Loan Party has taken or will take any action which might cause any of the Loan Documents, including this Agreement, to violate Regulation U or any other regulation of the Board of Governors of the Federal Reserve System or to violate the Securities Exchange Act of 1934 or any rule or regulation thereunder, in each case as now in effect or as the same may hereafter be in effect.

**Section 4.12** **Compliance with the Law**.  Borrower's and each other Loan Party's Properties are and will continue to be in compliance with all federal, state and local acts, rules and regulations, and all orders of any federal, state or local legislative, administrative or judicial body or official, except to the extent the failure to so comply could not reasonably be expected to result in a Material Adverse Effect. Borrower and each other Loan Party has obtained and will continue to maintain all permits, approvals, authorizations and licenses necessary to conduct its business as presently conducted except to the extent the failure to so comply could not reasonably be expected to result in a Material Adverse Effect.

**Section 4.13** **ERISA**.  Borrower and each other Loan Party is in compliance in all material respects with the applicable provisions of ERISA, and no "reportable event," as such term is defined in Section 4043 of ERISA, has occurred with respect to any Plan of Borrower or any Loan Party.

**Section 4.14** **Subsidiaries**.  A list of all the existing Subsidiaries of Borrower is provided in Schedule 4.14 attached hereto and incorporated by reference.

**Section 4.15** **Direct Benefit From Loans**.  Borrower has received or, upon the execution and funding thereof, will receive (a) direct benefit from the making and execution of this Agreement and the other documents to which it is a party, and (b) fair and independent consideration for the entry into, and performance of, this Agreement and the other documents to which it is a party.

**Section 4.16** **NO PRIMING LOANS**.  Neither Borrower nor any other Loan Party is in violation of any laws, statutes or regulations, which contain provisions which could potentially override Lender's security interest in the Collateral.

**Section 4.17** **Leases and Landlord Waivers**.  Borrower and/or its Subsidiaries are parties to certain lease agreements pertaining to real property upon which Borrower or a Subsidiary of Borrower operates its business and certain material personal property leases (individually, the "Lease" and

collectively, the "Leases").  Schedule 4.17 is complete and correct and fully and accurately describes all Leases to which Borrower and/or any of its Subsidiaries are a party.  Borrower has provided Lender with landlord waivers, in form and substance satisfactory to Lender, with respect to all real estate Leases, each of which landlord waivers has been duly executed by the landlord or such landlord's duly authorized representative and each of which landlord waiver is fully enforceable under the terms and conditions of the Leases and applicable state, local or municipal law except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

Section 4.18 **Patents, Trademarks, Copyrights and Licenses**.  Each of Borrower and its Subsidiaries owns or possesses all the patents, trademarks, service marks, trade names, copyrights and licenses necessary for the present and planned future conduct of its business without any known conflict with the rights of others.  All such patents, trademarks, service marks, trade names, copyrights, licenses and other similar rights are listed on Schedule 4.18 attached hereto.

Section 4.19 **Priority of Liens.** (i) When financing statements and other filings in appropriate form are filed in the appropriate offices, (ii) upon the taking of possession or control by the Lender of Collateral with respect to which a security interest may be perfected only by possession or control, (iii) when appropriate filings are properly filed and recorded in the United States Patent and Trademark Office and/or the United States Copyright Office and (iv) upon recording of the mortgages, deed of trust and the Brookshire Deed of Trust in the appropriate recording offices, the security interests and liens granted to Lender under this Agreement and the other Loan Documents will constitute valid and perfected first-priority Liens and security interests in and upon the Collateral, subject only to Permitted Liens.

Section 4.20 **Continuous Nature of Representations and Warranties**.  Each representation and warranty contained in this Agreement and the other Loan Documents shall be continuous in nature and shall remain accurate, complete and not misleading each time made during the term of this Agreement, except for changes in the nature of Borrower's or its Subsidiaries' business or operations that would render the information in this Agreement or the other Loan Documents, or any exhibit attached hereto or thereto either inaccurate, incomplete or misleading, so long as Lender has consented to such changes or such changes are expressly permitted by this Agreement, and except for such representations and warranties that by their nature are limited only to a specific date.

**ARTICLE V**
**AFFIRMATIVE COVENANTS**

Borrower will at all times prior to the Termination Date comply with the covenants contained in this Article V.

Section 5.01 **Financial Statements and Reports**.  Borrower and all Subsidiaries will promptly furnish to Lender from time to time upon request such information regarding the business and affairs and financial condition of Borrower and all its Subsidiaries as Lender may reasonably request, and will furnish to Lender:

(a) **Annual Financial Statements**.  As soon as available and in any event within one hundred twenty (120) days after the close of each fiscal year of Borrower, audited Financial Statements of Borrower and its Subsidiaries, consisting of the consolidated and consolidating, if applicable, balance sheets of Borrower and its Subsidiaries as at the end of such year and the

22

consolidated and consolidating, if applicable, operating statements of Borrower and its Subsidiaries, as at the end of such year (showing income, expenses and surplus), setting forth in each case in comparative form figures for the previous fiscal year, all prepared in accordance with GAAP, consistently applied, and in a manner acceptable to Lender and certified by an independent public accounting firm acceptable to Lender;

(b)    **Monthly Financial Statements**.  As soon as available and in any event within thirty (30) days after the end of each calendar month, the consolidated and consolidating, if applicable, unaudited balance sheets of Borrower and its Subsidiaries, at the end of such month and the consolidated and consolidating, if applicable, operating statements of Borrower and its Subsidiaries, for such month (showing income, expenses and surplus for such month and for the period from the beginning of the fiscal year to the end of such month), prepared on a basis consistent with prior internal practices;

(c)    **Monthly Bank Statements**.  As soon as available and in any event within fifteen (15) days after the end of each calendar month, Borrower and each Subsidiary shall provide Lender with a copy of all bank statements on all cash accounts, including, without limitation, all Operating Accounts and Blocked Accounts;

(d)    **Accounts Agings**.  As soon as available and in any event within fifteen (15) days (or earlier if deemed necessary by Lender in its sole discretion) after the end of each calendar month, consolidated and consolidating agings of all accounts payable and accounts receivable of Borrower (the "Account Agings") showing each such account which is thirty (30), sixty (60), ninety (90) days past the invoice date and, with respect to accounts receivable, reconciling such aging with the reports delivered to Lender pursuant to Section 5.01(g) hereof;

(e)    **Inventory Report**.  As soon as available and in any event within fifteen (15) days (or earlier if deemed necessary by Lender in its sole discretion) after the end of each calendar month, an Inventory perpetual report for Borrower and a schedule that lists Inventory by item, cost and location;

(f)    **[Reserved]**;

(g)    **Weekly Borrowing Base Reports**. On or before the last Business Day of each week and on each day a Revolving Advance is requested, a report in such form as Lender may request, reflecting the Eligible Accounts and Eligible Inventory of Borrower as of the end of the preceding week and calculating the Accounts Advance Amount and Inventory Advance Amount based thereon, together with the Account Agings, cash receipt journals or copies of checks, invoices for new billings, sales journals and backup for all miscellaneous credits and debits, purchases journals and cost of goods sold reports and inventory reports, which support such report.  Such report shall also reflect the amount of sales and receipts of Borrower during the preceding week and such other information as Lender may reasonably request; and

(h)    **Monthly Borrowing Base Reports**. As soon as available and in any event within fifteen (15) days (or earlier if deemed necessary by Lender in its sole discretion) after the end of each calendar month, a report in such form as Lender may request, reflecting the Eligible Accounts, Eligible Inventory and the Eligible Equipment of Borrower as of the end of the preceding month and calculating the Accounts Advance Amount, Inventory Advance Amount and the Net M&E Advance Amount based, thereon, together with the Account Agings, cash receipt journals or copies of checks, invoices for new billings, sales journals and backup for all

23

miscellaneous credits and debits, and inventory reports, which support such reports. Such reports shall also reflect the amount of sales and receipts of Borrower during the preceding month, a roll-forward of accounts receivable and such other information as Lender may reasonably request.

All balance sheets and other financial statements referred to in this Section 5.01 shall be in such detail as Lender may reasonably request (other than information delivered under Section 5.01(a))and shall conform to GAAP applied on a basis consistent with those of the Financial Statements, except only for such changes in accounting principles or practice with which independent certified public accountants concur.

Section 5.02   **Compliance with Laws; Payment of Taxes and Other Claims**. The Borrower and Borrower's Properties are and will continue to be in compliance with all federal, state and local acts, rules and regulations, and all orders of any federal, state or local legislative, administrative or judicial body or official, except as could not reasonably be expected to result in a Material Adverse Effect. Borrower has obtained and will continue to maintain all permits, approvals, authorizations and licenses necessary to conduct its business as presently conducted, except as could not reasonably be expected to result in a Material Adverse Effect.

Section 5.03   **Maintenance**. Borrower will and will cause each Subsidiary to: (a) maintain its corporate, partnership or limited liability company, as applicable, existence, rights and franchises; (b) observe and comply with all valid laws, statutes, codes, acts, ordinances, judgments, injunctions, rules, regulations, certificates, franchises, permits and licenses of all federal, state, county, municipal and other governmental authorities as could not reasonably be expected to result in a Material Adverse Effect; (c) maintain its Properties (and any Properties leased by or consigned to it or held under title retention or conditional sales contracts) in good and workable condition (ordinary wear and tear excepted) at all times and make all repairs, replacements, additions, betterments and improvements to its Properties as are needful and proper so that the business carried on in connection therewith may be conducted properly and efficiently at all times; (d) not misuse, abuse, waste, destroy, endanger or allow its Properties to deteriorate; (e) protect the title to the Collateral; and (f) maintain and keep books of records and accounts, all in accordance with GAAP, consistently applied, of all dealings and transactions in relation to its business and activity.

Section 5.04   **Further Assurances**. Borrower will and will cause each Subsidiary to cure promptly any defects in the execution and delivery of the other Loan Documents, including, without limitation, this Agreement. Borrower at its expense will promptly execute and deliver to Lender upon request all such other and further documents, agreements and instruments, and do all such additional and further acts, filings, deeds and give such assurances necessary or appropriate in order to effectuate the agreements of Borrower or any Subsidiary in the Loan Documents, including, without limitation, this Agreement, or to further evidence and more fully describe the collateral intended as security for the Revolving Credit Facility and Term Loan, or to correct any omissions in the Loan Documents, or more fully to state the security obligations set out herein or in any of the Loan Documents, or to perfect, protect or preserve any Liens created pursuant to any of the Loan Documents, or to make any recordings, to file any notices, or obtain any consents, all as may be reasonably necessary or appropriate in connection therewith.

Section 5.05   **Reimbursement of Expenses**. Borrower agrees to reimburse Lender on demand for the actual amount of all reasonable costs and expenses, including reasonable and documented attorneys' fees (limited to one counsel to Lender in each relevant jurisdiction), fees of auditors permitted hereunder to be retained and accountants retained with the Borrower's consent (not to be unreasonably withheld, delayed or conditioned), and investigation expenses, which Lender may incur, together with interest the rate specified in Section 2.02 hereof, in: (a) preparing, amending, interpreting, administering

24

**Exhibit "A"**

and enforcing this Agreement and any and all other Loan Documents contemplated hereby; (b) protecting, preserving or enforcing any lien, security or other right granted by Borrower to Lender or arising under applicable law in respect of any of the Loan Documents, whether or not suit is brought, including protecting the Properties or business of Borrower or any Subsidiary or to collect the amounts due under the Revolving Credit Facility and Term Loan, (c) defense of Lender's ownership rights in the Collateral including its priority or (d) connection with any federal or state insolvency proceeding commenced by or against Borrower, or any subpoena or other legal process in any way relating to Borrower, including those arising out of the automatic stay, seeking dismissal or conversion of the bankruptcy proceeding or opposing confirmation of Borrower's plan thereunder. This provision shall survive termination of this Agreement. Notwithstanding the existence of any law, statute, rule or otherwise, in any jurisdiction which may provide Borrower with a right to attorneys' fees or costs, Borrower hereby waives any and all rights to seek such attorneys' fees or costs and Borrower agrees that Lender exclusively shall be entitled to indemnification and recovery of any and all attorneys' fees or costs in respect to any litigation based hereon, arising out of, or related hereto, whether under, or in connection with, this and/or any agreement executed in conjunction herewith, or any course of conduct, course of dealing, statements (whether verbal or written) or actions of either party.

**Section 5.06    Insurance**.  Borrower and each Subsidiary now maintains and will continue to maintain with financially sound and reputable insurers, insurance with respect to their respective Properties and businesses against such liabilities, casualties, risks and contingencies and in such types and amounts as is customary in the case of companies engaged in the same or similar businesses and similarly situated but in any event, all fixed assets of Borrower shall be insured for an amount at least equal to the fair market value of such fixed assets.  All such policies shall name Lender as loss payee and mortgagee, and shall provide that the insurer shall provide Lender with thirty (30) days prior written notification of the cancellation of such policies.  Upon request of Lender, Borrower will furnish or cause to be furnished to Lender from time to time a summary of the insurance coverage of Borrower and the Subsidiaries in form and substance satisfactory to Lender and if requested will furnish Lender copies of the applicable policies.

**Section 5.07    Right of Inspection**.  Borrower will permit and will cause each Subsidiary to permit any officer, employee or agent of Lender to visit and inspect any of the Properties of Borrower, or any Subsidiary, to conduct collateral reviews, to examine Borrower's or any Subsidiary's books of record and accounts, to take copies and extracts therefrom, and to discuss the affairs, finances and accounts of Borrower or any Subsidiary with Borrower's or such Subsidiary's officers, employees, accountants and auditors, all at such reasonable times and as often as Lender may desire.  Borrower shall reimburse Lender for (i) all of Lender's fees, costs, and expenses in connection with the collateral reviews, which expenses shall be $1,100 per person per day for all collateral reviews plus any additional out-of-pocket expenses incurred in connection with such collateral reviews and (ii) all of Lender's fees, costs and expenses (including any fees, costs and expenses incurred by any appraiser) in connection with any appraisal of all or any part of Borrower's Inventory.

**Section 5.08    Notice of Certain Events**.  Borrower shall promptly notify Lender if Borrower learns of the occurrence of (a) any event which constitutes a Default, together with a detailed statement by a responsible officer of Borrower of the steps being taken to cure the effect of such Default; (b) the receipt of any notice from, or the taking of any other action by, the holder of any promissory note, debenture or other evidence of indebtedness of Borrower or any Subsidiary or of any security (as defined in the Securities Act of 1933, as amended) of Borrower or any Subsidiary with respect to a claimed default, together with a detailed statement by a responsible officer of Borrower specifying the notice given or other action taken by such holder and the nature of the claimed default and what action such Borrower, or such Subsidiary is taking or proposes to take with respect thereto; (c) any legal, judicial or

25

regulatory proceedings affecting Borrower or any Subsidiary or any of the Properties of Borrower or any Subsidiary in which the amount involved is material and is not covered by insurance or which, if adversely determined, would have a material and adverse effect on the business or the financial condition of Borrower or any Subsidiary; (d) any dispute between Borrower or any Subsidiary and any governmental or regulatory body or any other Person which, if adversely determined, might materially interfere with the normal business operations of Borrower or any Subsidiary; or (e) any material adverse changes, either in any case or in the aggregate, in the assets, liabilities, financial condition, business, operations, affairs or circumstances of Borrower or any Subsidiary, from those reflected in the Financial Statements or by the facts warranted or represented in any Loan Document, including without limitation this Agreement.

Section 5.09   **ERISA Information and Compliance**.   Borrower will promptly furnish to Lender (a) if requested by Lender, promptly after the filing thereof with the United States Secretary of Labor or the Pension Benefit Guaranty Corporation, copies of each annual and other report with respect to each Plan or any trust created thereunder, and (b) immediately upon becoming aware of the occurrence of any "reportable event," as such term is defined in Section 4043 of ERISA, or of any "prohibited transaction," as such term is defined in Section 4975 of the Internal Revenue Code of 1986, as amended, in connection with any Plan or any trust created thereunder, a written notice signed by the Chief Executive Officer or Chief Financial Officer of Borrower specifying the nature thereof, what action Borrower or any of its Subsidiaries is taking or proposes to take with respect thereto, and, when known, any action taken by the Internal Revenue Service with respect thereto.  Borrower will fund, or will cause its Subsidiaries to fund, all current service pension liabilities as they are incurred under the provisions of all Plans from time to time in effect for the benefit of employees of Borrower or any of its Subsidiaries, and comply with all applicable provisions of ERISA.

Section 5.10   **Environmental Requirements**.   Borrower shall and shall cause each Subsidiary to comply in all material respects with all Environmental Laws applicable to Borrower and/or such Subsidiary or to its Property with respect to occupational health and safety, hazardous waste and substances and environmental matters.  Borrower shall and shall cause each Subsidiary to promptly notify Lender of its receipt of any notice of a violation or an alleged violation of any such federal laws, state statutes, municipal ordinances or other governmental standards, rules or regulations.  Borrower shall and shall cause each Subsidiary to indemnify and hold Lender harmless from all loss, cost, damages, claim and expense incurred by Lender on account of Borrower's failure to perform the obligations of this Section 5.10.

Section 5.11   **Additional Guarantors**.   Borrower shall cause each of its now or hereafter existing Subsidiaries to duly execute and deliver, or become a party to, a Guaranty Agreement with such other Loan Documents as Lender may require as security therefor from time to time.

Section 5.12   **Compliance Certificate.**   At the time that Borrower provides the monthly Financial Statements pursuant to Section 5.01 hereof, Borrower shall also provide a Compliance Certificate which (a) states that the information on any and all schedules to this Agreement is complete and accurate as of the date of such certificate or, if such is the case, attaches to such certificate updated schedules, and (b) states that, based on a reasonably diligent examination, no Default or Event of Default, has occurred or exists, or, if such is not the case, specifies such Default or Event of Default, and its nature, when it occurred, whether it is continuing and the steps taken or being taken by Borrower with respect thereto.

Exhibit "A"

**Section 5.13** **Blocked Accounts**.  At all times during the term of this Agreement, Borrower will maintain Blocked Accounts as required by Section 2.11 hereof, and will direct all collections and other Receipts to such Blocked Accounts in accordance with Section 2.12 hereof.

**Section 5.14** **Subordinated Debt Legend and Inspection.**

(a)     Borrower shall cause each instrument or document which now or hereafter evidences all or any portion of the Subordinated Debt to be conspicuously marked with a legend as provided in the subordination agreement related thereto.

(b)     Borrower shall and shall cause each Subsidiary, if any, to permit Lender at any reasonable time, and from time to time, to examine and make copies and abstracts from Borrower's books, records, instruments and documents evidencing or pertaining to the Subordinated Debt.

**Section 5.15** **Appraisals**.  Upon Lender's request, or, after and during the continuance of a Default or Event of Default, at any time, Borrower agrees that Lender or its agents may perform or obtain third-party appraisals on the Collateral, including the Real Estate.  Borrower agrees to reimburse Lender for the costs and expenses relating to all such appraisals.  All appraisals shall be performed by appraisers elected by Lender in its sole discretion.

**Section 5.16** **Post-Closing**.  Borrower shall, (i) within ninety (90) days after the date hereof, provide evidence to Lender that each of the accounts held by Borrower at Wells Fargo have been closed, and (ii) use commercially reasonable efforts, within thirty (30) days after the date hereof, to deliver a landlord waiver, in form and substance satisfactory to Lender with respect to the leased location of Borrower located at 2525 North Loop West, Houston, TX  77008 (it being understood and agreed that Lender may institute an Availability Reserve until such time as the landlord waiver is received and the failure to so deliver such landlord waiver shall not result in an Event of Default hereunder).

## ARTICLE VI
## NEGATIVE COVENANTS

Without the prior written consent of Lender, Borrower will at all times from the date hereof and prior to the Termination Date comply with the covenants contained in this Article VI.

**Section 6.01** **Debts, Guarantees and Other Obligations.**     Borrower will not, and will not permit any Subsidiary to incur, create, assume or in any manner become or be liable in respect of any indebtedness (including obligations for the payment of rentals); and no Borrower will, or will permit a Subsidiary to, guarantee or otherwise in any way become or be responsible for indebtedness of any other Person, except that the foregoing restrictions shall not apply to (i) the Obligations to Lender; (ii) Subordinated Debt; (iii) current indebtedness maturing in less than one year and incurred in the ordinary course of business for raw materials, supplies, equipment, services, taxes or labor, (iv) lease payments under leases disclosed to Lender prior to the date hereof, and (v) any other indebtedness to which Lender has expressly consented in writing.

**Section 6.02** **Liens.**  Borrower will not, and will not permit any Subsidiary to create, incur, assume or permit to exist any Lien on any of its Properties (now owned or hereafter acquired), except the following (the "Permitted Liens"):

(a)        Liens securing the payment of the Obligations to Lender;

(b)        Liens for taxes, assessments, or other governmental charges not yet due or which are being contested by appropriate action promptly initiated and diligently conducted, if such reserve as shall be required by GAAP shall have been made therefor;

(c)        Liens of landlords, vendors, carriers, warehousemen, mechanics, laborers and materialmen arising by law in the ordinary course of business for sums not yet due or, subject to the written approval of Lender, being contested by appropriate action promptly initiated and diligently conducted, if such reserve as shall be required by GAAP shall have been made therefor;

(d)        Liens existing on Property owned by Borrower or any Subsidiary on the date of this Agreement which have been disclosed to and permitted by Lender in writing and listed on Schedule 6.02 attached hereto, but not any renewals and extensions thereof;

(e)        pledges or deposits made in the ordinary course of business in connection with workmen's compensation, unemployment insurance, social security and other like laws;

(f)        inchoate liens arising under ERISA to secure the contingent liability of Borrower or any Subsidiary permitted by Section 5.09 hereof;

(g)        judgment Liens arising solely as a result of the existence of judgments, orders, or awards that do not constitute an Event of Default under this Agreement and occur after the Closing Date, and

(h)        with respect to any Real Estate or other real property, easements, rights of way, and zoning restrictions that do not materially interfere with or impair the use or operation thereof.

**Section 6.03    Investments, Loans and Advances.**        Borrower will not, and will not permit any Subsidiary to, make or permit to remain outstanding any loans or advances to or investments in any Person, except that the foregoing restriction shall not apply to:

(a)        loans, advances or investments the material details of which have been set forth in the Financial Statements or have been otherwise disclosed to Lender in writing prior to the execution of this Agreement;

(b)        investments in direct obligations of the United States of America or any agency thereof;

(c)        investments in certificates of deposit issued by commercial banks in the United States having a combined capital and surplus in excess of Fifty Million and No/100 Dollars ($50,000,000.00);

(d)        investments in commercial paper with the best rating by Standard & Poor's, Moody's Investors Service, Inc., or any other rating agency satisfactory to Lender issued by companies in the United States with a combined capital and surplus in excess of One Hundred Million Dollars and No/100 ($100,000,000.00);

(e)        loans, advances or investments permitted by Section 6.01 hereof;

(f)      salaries, bonuses, wages and commissions to employees of the Borrower and its Subsidiaries in the ordinary course of business; and

(g)      advances made in the ordinary course of business to employees or directors of the Borrower and its Subsidiaries for travel or other expenses incurred in the ordinary course of business not to exceed $10,000 at any time outstanding.

**Section 6.04      Dividends, Distributions and Redemptions.**      Borrower will not, and will not permit any Subsidiary to, declare, pay or make any Distributions of any kind to its shareholders, or make any other distribution on account of, or purchase, acquire or redeem or retire any ownership interest in it.

**Section 6.05      Sale of Assets.** Except in accordance with Borrower's ordinary course of business, Borrower will not, and will not permit any Subsidiary to, sell, lease, assign, transfer or otherwise dispose of (i) Collateral, except as otherwise specifically permitted by this Agreement, or (ii) all or any substantial part of its assets, if any, which do not constitute Collateral; provided, however, that the foregoing shall not prohibit (a) the sale of Stock, Real Estate or other real property of the Borrower, any of its Subsidiaries, in each case, so long as the proceeds thereof are applied in accordance with Section 2.07(b) (and with respect to any sale of Real Estate, the net cash proceeds received in such sale are sufficient to repay all Obligations relating to the Term Loan in full), and (b) any grant of Liens permitted under Section 6.02.

**Section 6.06      Limitation on Leases.**      Borrower will not, and will not permit any Subsidiary to, create, incur, assume or suffer to exist any obligation for the payment of rent or hire of Property of any kind whatsoever (real or personal), under leases or lease agreements, without the prior written consent of Lender, except leases and lease agreements described on Schedule 4.17 attached hereto.   In addition, Borrower will not, and will not permit any Subsidiary to, amend, restate, extend, or otherwise modify any leases or lease agreements described on Schedule 4.17 attached hereto, without the prior written consent of Lender, which consent may be given or withheld by Lender in its sole discretion.

**Section 6.07      Corporate Change.**      Borrower will not, and will not permit any Subsidiary to, (a) amend its organizational documents or otherwise change its name or structure in a manner materially adverse to the Lender, or (b), without the prior consent of Lender (i) consolidate with or merge into or acquire any Person, or permit any other Person to consolidate with or merge into or acquire Borrower or any Loan Party, (ii) acquire the Stock of any Person or form any Subsidiary or (iii) permit any material change to be made in the character of its business as carried on at the date hereof.

**Section 6.08      ERISA Compliance**.  Borrower will not permit any Plan maintained by it or any Subsidiary to:

(a)      engage in any "prohibited transaction" as such term is defined in Section 4975 of the Internal Revenue Code of 1986, as amended;

(b)      incur any "accumulated funding deficiency" as such term is defined in Section 302 of ERISA; or

(c)      terminate any such Plan in a manner which could result in the imposition of a Lien on the Property of Borrower or any Subsidiary pursuant to Section 4068 of ERISA.

29

**Section 6.09** **Issuance of Stock and Interests**. During the term of this Agreement, Borrower will not, and will not permit any Subsidiary to, issue any additional shares of Stock or other ownership interests, as applicable, except as otherwise permitted under Section 6.05.

**Section 6.10** **Changes in Accounting Methods**. Borrower will not, and will not permit any Subsidiary to, make any change in its accounting method as in effect on the date of this Agreement or change its fiscal year ending date from December 31, unless such change has the prior, written approval of Lender.

**Section 6.11** **Transactions With Affiliates**. Borrower will not, and will not permit any Subsidiary to, directly or indirectly, enter into any transaction (including, but not limited to, the sale or exchange of property or the rendering of any service) with any Affiliate, other than in the ordinary course of its business and upon substantially the same or better terms as it could obtain in an arm's length transaction with a Person who is not an Affiliate.

**Section 6.12** **Use of Proceeds**. Borrower will not use the proceeds of the Revolving Credit Facility or the Term Loan for purposes other than those set forth in Section 4.11 hereof.

**Section 6.13** **[Reserved]**.

**Section 6.14** **[Reserved]**.

**Section 6.15** **Ratio of Senior Debt to Tangible Net Worth.** During the term of this Agreement, Borrower shall not permit its ratio of (a) Senior Debt to (b) Tangible Net Worth, on a consolidated basis, to be greater than the ratio set forth below for the one calendar month period then ending as set forth below:

| Period | Ratio |
|---|---|
| February 28, 2016 through May 3, 2016 | 4.00:1.00 |
| June 30, 2016 through August 31, 2016 | 5.00:1.00 |
| September 30, 2016 through December 31, 2016 | 6.00:1.00 |
| December 31, 2016 and the last day of each calendar month thereafter | 6.00:1.00 |

**Section 6.16** **[Reserved]**.

**Section 6.17** **Senior Debt Payment Coverage Ratio.** During the term of this Agreement, Borrower shall maintain, as of the last day of each calendar month set forth below for the test period set forth below, a Senior Debt Payment Coverage Ratio of not less than the ratio set forth below:

| Period | Ratio |
|---|---|
| November, 30, 2016 for the one month period then ending | 0.75:1.00 |
| December 31, 2016 for the two month period then ending | 0.75:1.00 |
| January 30, 2017 for the three month period then ending | 0.75:1.00 |
| February 28, 2017 for the four month period then | 0.75:1.00 |

[Brougher] Loan Agreement
46475-0047
DA\400319979.12

**Exhibit "A"**

| | |
|---|---|
| ending | |
| March 31, 2017 for the five month period then ending | 0.75:1.00 |
| April 30, 2017 for the six month period then ending | 0.80:1.00 |
| May 31, 2017 for the seven month period then ending | 0.80:1.00 |
| June 30, 2017 for the eight month period then ending | 0.80:1.00 |
| July 31, 2017 for the nine month period then ending | 0.85:1.00 |
| August 31, 2017 for the ten month period then ending | 0.85:1.00 |
| September 30, 2017 for the eleven month period then ending | 0.85:1.00 |
| October 31, 2017 for the twelve month period then ending | 0.90:1.00 |
| November 30, 2017 and the last day of each calendar month thereafter for the twelve month period then ending | 1.00:1.00 |

Section 6.18   **Tangible Net Worth.**  (a) During the term of this Agreement, Borrower will not permit its Tangible Net Worth, on a consolidated basis, to be less than the amounts set forth in the table below for the one month period then ending, which determination shall be made on the last day of each calendar month:

| Period | Minimum Tangible Net Worth |
|---|---|
| February 29, 2016 | $3,400,000 |
| March 31, 2016 | $3,400,000 |
| April 30, 2016 | $3,000,000 |
| May 31, 2016 | $3,000,000 |
| June 30, 2016 | $2,750,000 |
| July 31, 2016 | $2,750,000 |
| August 31, 2016 | $2,500,000 |
| September 30, 2016 | $2,500,000 |
| October 31, 2016 | $2,500,000 |
| November 30, 2016 | $2,000,000 |
| December 31, 2016 | $2,000,000 |

(b) During the term of this Agreement, Borrower will not permit its Tangible Net Worth, on a consolidated basis, to be less than the amounts set forth in the table below for the one year period then ending, which determination shall be made on the last day of each fiscal year:

| Period | Minimum Tangible Net Worth |
|---|---|
| From January 1, 2017 through December 31, 2017 | $2,000,000 plus 50% of positive Net Income positive for such fiscal year |
| From January 1, 2018 through December 31, 2018 | Minimum Tangible Net Worth required hereunder for the immediately preceding period plus 50% of positive Net Income for such fiscal year. |
| January 1, 2019 and the last day of each calendar month thereafter | Minimum Tangible Net Worth required hereunder for the immediately preceding period plus 50% of positive Net Income for such fiscal year. |

**Section 6.19    Restricted Payments.**  Borrower shall not, directly or indirectly, declare, order, pay, make or set apart any sum for any payment or prepayment of principal, premium, if any, or interest on, any Subordinated Debt to the extent prohibited by the applicable Subordination Agreement.

**Section 6.20    Subordinated Loan Documents.**  Borrower will not change or amend the terms of any Subordinated Debt or any of the documents related thereto without the written consent of Lender; provided that, without the consent of the Lender, Jerry Brougher shall be permitted to amend the Subordinated Debt owed to him on the date hereof to (x) extend the maturity thereof to a date that is not earlier than six (6) months after the Drawdown Termination Date and (y) provide that such Subordinated Debt shall cross-accelerate (but not cross-default) to the Obligations.

## ARTICLE VII
## EVENTS OF DEFAULT

**Section 7.01    Events.**  Any of the following events shall be considered an "Event of Default" as that term is used herein:

(a)    **Principal and Interest Payments.**  Failure to pay or prepay when due of any installment of principal or interest on any Advance or any other Obligations; or

(b)    **Representations and Warranties.**  Any representation or warranty made by Borrower, any Subsidiary or any Guarantor in any Loan Document, including this Agreement, in particular Article IV, proves to have been incorrect in any material respect as of the date thereof; or any representation, statement (including financial statements), certificate or data furnished or made by Borrower, any Subsidiary or any Guarantor (or any officer, accountant or attorney of Borrower or any Subsidiary) under any Loan Document, including this Agreement, proves to have been untrue in any material respect, as of the date as of which the facts therein set forth were stated or certified; or

(c)    **Covenants.**  Default is made in the due observance or performance of any of the covenants or agreements contained in (i) Article V or Article VI of this Agreement; or

(d)      **Conditions Precedent**.  Borrower fails to satisfy, or cause to be satisfied, any of the conditions precedent contained in Article VIII hereof which are not to be completed as of the date of this Agreement; or

(e)      **Other Loan Document Obligations**.  Default is made in the due observance or performance by Borrower, any Subsidiary or any Guarantor of any of the covenants or agreements contained in this Agreement (except to the extent covered by Section 7.01(c)) or any other Loan Document other than this Agreement, and such default continues unremedied beyond the expiration of any applicable grace period which may be expressly allowed under this Agreement or such other Loan Document; or

(f)      **Bankruptcy Proceedings**.  Borrower or any Loan Party shall (i) apply for, consent to or suffer the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator or similar fiduciary of itself or of all or a substantial part of its Property, (ii) admit in writing its inability, or be generally unable, to pay its debts as they become due or cease operations of its present business, (iii) make a general assignment for the benefit of creditors, (iv) commence a voluntary case under any state or federal bankruptcy laws (as now or hereafter in effect), (v) be adjudicated a bankrupt or insolvent, (vi) file a petition seeking to take advantage of any other law providing for the relief of debtors, (vii) acquiesce to, or fail to have dismissed, within thirty (30) days, any petition filed against it in any involuntary case under such bankruptcy laws, or (viii) take any action for the purpose of effecting any of the foregoing; or

(g)      **Discontinuance of Business**. Borrower or any Loan Party discontinues its usual business; or

(h)      **Default on Other Debt or Security**. Borrower or any Loan Party fails to make any payment due on any indebtedness or security (as "security" is defined in the Securities Act of 1933, as amended) or any event shall occur or any condition shall exist in respect of any indebtedness or security of Borrower or any Loan Party or under any agreement securing or relating to such indebtedness or security, the effect of which is (i) to cause or to permit any holder of such indebtedness or other security or a trustee to cause (whether or not such holder or trustee elects to cause) such indebtedness or security, or a portion thereof, to become due prior to its stated maturity or prior to its regularly scheduled dates of payment, or (ii) to permit a trustee or the holder of any security (other than common Stock of Borrower or any Subsidiary) to elect (whether or not such holder or trustee does elect) a majority of the directors or managers of Borrower or any Loan Party; or

(i)      **Undischarged Judgments**.  With respect to the litigation matter identified on Schedule 8.15 hereof only, if judgment for the payment of money in excess of One Hundred Fifty Thousand and No/100 Dollars ($150,000.00) or with respect to any other matter, if judgment for the payment of money in excess of Twenty-Five Thousand and No/100 Dollars ($25,000), in either or in each case, as applicable, is rendered by any court or other governmental body against Borrower or any Loan Party and Borrower or any Loan Party does not immediately discharge the same or provide for its immediate discharge in accordance with its terms, or procure a stay of execution thereof within ten (10) days from the date of entry thereof, and within said period of ten (10) days from the date of entry thereof or such longer period during which execution of such judgment shall have been stayed, appeal therefrom and cause the execution thereof to be stayed during such appeal while providing such reserves therefor as may be required under GAAP; or

(j)      **Insolvency**.  Borrower or any Loan Party shall be or become insolvent; or

33

(k)     **Fraudulent Transfers**.  If Borrower or any Loan Party shall have concealed, removed, or permitted to be concealed or removed, any part of its Property, with intent to hinder, delay or defraud its creditors or any of them, or made or suffered a transfer of any of its Property which may be fraudulent under any bankruptcy, fraudulent transfer or similar law; or shall have made any transfer of its Property to or for the benefit of a creditor at a time when other creditors similarly situated have not been paid; or shall have suffered or permitted, while insolvent, any creditor to obtain a Lien upon any of its Property through legal proceedings or distraint or other process which is not vacated within sixty (60) days from the date thereof; or

(l)     **Forfeiture**.  The filing of formal charges under a federal or state law for which forfeiture of Borrower's or any Loan Party's Property is a potential penalty; or

(m)     **Challenge to Agreement or any Other Loan Document**.  Borrower or any or any Loan Party or any Affiliate of any of them, shall challenge or contest in any action, suit or proceeding the validity or enforceability of this Agreement or any of the other Loan Documents, the legality or enforceability of any of the Obligations or the perfection or priority of any Lien granted to Lender; or

(n)     **Repudiation of or Default under Guaranty Agreement**.  Any Guarantor shall revoke or attempt to revoke the Guaranty Agreement signed by such Guarantor, or shall repudiate such Guarantor's liability thereunder or shall be in default under the terms thereof; or

(o)     **Revocation Proceeding**.  Any regulatory officer in the State of Texas or in any other state in which Borrower or any Subsidiary has a location brings an action or proceeding to revoke or otherwise attempts to revoke any material license issued to Borrower or any Subsidiary; or

(p)     **Process Against Borrower**.   The issuance of an injunction or order of attachment, or any other process which is prior to a final judgment, for a claim of Twenty-Five Thousand and No/100 Dollars ($25,000.00) or more against Borrower or any Subsidiary, or any of Borrower's or such Subsidiary's Property, or any Property pledged to secure the Obligations; or

(q)     **Margin Stock**.  The failure of Borrower, any Loan Party or the Property pledged to secure the Obligations to comply with Regulations U or X of the Board of Governors of the Federal Reserve System, as amended; or

(r)     **Decline in Value of Collateral**.  Any deterioration, impairment or decline in character or value of any part of the Collateral subject to a Lien in favor of Lender to secure the Obligations (whether actual or reasonably anticipated) that causes such Collateral in the judgment of Lender to become unsatisfactory as to character or value; or

(s)     **Financial Responsibility**.  If in the reasonable exercise of its judgment, Lender determines that the financial responsibility of Borrower or any other Loan Party has become otherwise unsatisfactory; or

(t)     **Change of Control.**  The occurrence of a Change of Control; or

(u)    **Payments on Subordinated Debt.**  Borrower shall make any payment on account of the Subordinated Debt, except as is permitted by the applicable Subordination Agreement; or

(v)    **Repudiation of or Default under Subordination Agreement.**  Borrower or any Subsidiary shall revoke or attempt to revoke a Subordination Agreement signed by Borrower or such Subsidiary, or shall repudiate Borrower's or such Subsidiary's liability thereunder or shall be in default under the terms thereof.

**Section 7.02**    **Remedies**.  Upon the happening of any Event of Default specified in <u>Section 7.01</u> hereof, (a) Lender may declare the entire principal amount of all Obligations then outstanding including interest accrued thereon to be immediately due and payable (provided, that the occurrence of any event described in <u>Sections 7.01(f)</u> or <u>7.01(j)</u> hereof shall automatically accelerate the maturity of the Obligations, without the necessity of any action by Lender) without presentment, demand, protest, notice of protest or dishonor, notice of default, notice of intent to accelerate the maturity thereof, notice of acceleration of the maturity thereof, or other notice of any kind, all of which are hereby expressly waived by Borrower and each other Loan Party; and (b) the Commitment shall immediately cease and terminate unless and until Lender shall reinstate same in writing.  In addition to and not in limitation of any of the other rights and remedies provided to Lender hereunder or under the other Loan Documents in connection with the Property of Borrower and the other Loan Parties in which Lender has a Lien, Borrower hereby agrees that upon request by Lender during the occurrence of an Event of Default, Borrower shall, and shall cause each Loan Party to, reasonably cooperate with Lender in the transfer of, and will, and will cause each Loan Party to, execute all documentation reasonably requested by Lender in connection with the transfer of, to such Person as shall be directed by Lender, any or all of the Collateral then held by the Loan Parties, and in connection therewith Borrower agrees, and will cause each Loan Party to agree, to take all other actions reasonably necessary in order to effectuate the transfer of any or all of such Collateral.

**Section 7.03**    **Prohibition of Transfer, Assignment and Assumption**.  This Agreement pertains to the extension of debt financing and financial accommodations for the benefit of Borrower and each other Loan Party and cannot be transferred to, assigned to or assumed by any other Person either voluntarily or by operation of law. In the event Borrower or any Loan Party becomes a debtor under the Bankruptcy Code of the United States or under the law of any foreign country, any trustee or debtor in possession may not assume or assign this Agreement nor delegate the performance of any provision hereunder.

**Section 7.04**    **Right of Setoff**.  Lender and any agent bank of Lender is hereby authorized at any time and from time to time, without notice to Borrower (any such notice being expressly waived by Borrower), to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by Lender or any agent bank of Lender to or for the credit or the account of Borrower against any and all of the Obligations of Borrower, irrespective of whether or not Lender shall have made any demand under this Agreement and although such obligations may, be unmatured. Lender agrees promptly to notify Borrower after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.  The rights of Lender under this <u>Section 7.04</u> are in addition to other rights and remedies (including, without limitation, other rights of setoff) which Lender may have.  The rights contained in this <u>Section 7.04</u> shall inure to the benefit of any participant in any loans made hereunder.

## ARTICLE VIII
## CONDITIONS

The obligation of Lender to make the Advances under the Revolving Credit Facility and Term Loan is subject to the accuracy of each and every representation and warranty of Borrower and each other Loan Party made or referred to in each Loan Document, including this Agreement, or in any certificate delivered to Lender pursuant to or in connection with any Loan Document, including this Agreement, to the performance by Borrower of its obligations to be performed hereunder on or before the date of the loan, and to the satisfaction of the following further conditions which must be satisfied as of the date of this Agreement or advance under the Revolving Credit Facility and Term Loan.

**Section 8.01    Closing**.  The delivery of all instruments and certificates referred to in this Article VIII not theretofore delivered and for the making of the initial loans provided for in Article II of this Agreement shall occur on or before March 4, 2016 (the "Closing Date").

**Section 8.02    Officer's Certificate**.  Lender shall have received a closing certificate signed by the President, Chief Executive Officer or Chief Financial Officer of Borrower, dated as of the Closing Date, stating that (a) all representations and warranties set forth in this Agreement and the other Loan Documents are true and correct on and as of the Closing Date and (b) on the Closing Date no Default or Event of Default has occurred or is continuing.

**Section 8.03    Secretary's Certificate**.  Lender shall have received a certificate of the Secretary or Assistant Secretary (or other equivalent officer, partner or manager) of Borrower in form and substance satisfactory to Lender dated as of the Closing Date which shall certify (a) copies of the resolutions, in form and substance satisfactory to Lender, of the board or directors, managers or other equivalent governing body of Borrower authorizing (x) the execution, delivery and performance of this Agreement and the other Loan Documents to which Borrower is a party and (y) the granting by Borrower of the security interests in and liens upon the Collateral to secure the Obligations (and such certificate shall state that such resolutions have not been amended, modified, revoked or rescinded as of the Closing Date), (b) the incumbency and signature of the officers of Borrower authorized to execute this Agreement and the other Loan Documents, (c) certified copies of the organizational documents of Borrower as in effect on the Closing Date, complete with all amendments thereto, and (d) the good standing (or equivalent status) of Borrower in its jurisdiction of organization and each applicable jurisdiction where the conduct of such Borrower's business activities or the ownership of its properties necessitates qualification, as evidenced by good standing certificate(s) (or the equivalent thereof issued by any applicable jurisdiction), issued by the Secretary of State or other appropriate official of each such jurisdiction.

**Section 8.04    Opinion of Borrower's Counsel.**  Lender shall have received on or before the Closing from counsel for Borrower and each Loan Party a favorable written opinion satisfactory to Lender and its counsel.

**Section 8.05    Counsel of Lender.**  At the time of the loans hereunder, all legal matters incident to the transactions herein contemplated shall be satisfactory to counsel of Lender.

**Section 8.06    No Default.**  At the time of each loan hereunder, no Default shall have occurred, and there shall not have occurred any condition, event or act which constitutes, or with notice or lapse of time (or both) would constitute a default or event of default under any loan agreement, note agreement or trust indenture to which Borrower or any Loan Party is a party.

36

**Section 8.07** **No Material Adverse Changes**.  Prior to each loan, there shall have occurred, in the opinion of Lender, no material adverse changes, either in any case or in the aggregate, in the assets, liabilities, financial condition, business, operations, affairs or circumstances of Borrower or any Loan Party from those reflected in the Financial Statements or by the facts warranted or represented in any Loan Document.

**Section 8.08** **Guaranties**.  Borrower shall cause Wade Brougher and any Person (other than Jerry Brougher) who from time to time owns forty-five percent (45%) or more of Borrower, to execute and deliver to Lender, in form and substance satisfactory to Lender, a Guaranty Agreement.

**Section 8.09** **Recordings**.  The applicable Loan Documents, including financing statements, security agreements and other notices related thereto, shall have been duly delivered to the appropriate offices for filing, recording or registration, and Lender shall have received confirmations of receipt thereof from the appropriate filing, recording or registration offices.

**Section 8.10** **Landlord and Mortgagee Waivers**.  Each landlord of Borrower and/or its Subsidiaries, or mortgagee of any of Borrower's and/or its Subsidiaries' real property, each as disclosed on Schedule 4.17, shall have executed and delivered, in form and substance satisfactory to Lender, in sufficient executed counterparts for recording purposes, waivers of any Liens to which it may be entitled, in favor of Lender.

**Section 8.11** **Closing Fee**.  Lender shall have received, in immediately available funds, the Closing Fee payable on the Closing Date.

**Section 8.12** **Financial Condition**.  Before the initial Advance on the Closing Date, the results of the examination by Lender of the financial condition of Borrower and each of its Subsidiaries including, but limited to, the examination of the Financial Statements and analysis of related data, shall be satisfactory to Lender, in its sole and absolute discretion.  After the Closing Date, but before Lender makes each subsequent Revolving Advance, the results of the examination by Lender shall be satisfactory to Lender in its sole discretion.

**Section 8.13** **Additional Matters**.  Lender shall have received all exhibits, annexes schedules herein referenced and such additional reports, certificates, documents, statements, legal opinions, agreements and instruments, in form and substance reasonably satisfactory to Lender, as Lender shall have reasonably requested from Borrower, each Loan Party and their respective counsel.

**Section 8.14** **Revolving Credit Advances**.  Revolving Advances shall further be subject to the following specific conditions:

(a)     There shall have been no Default under this Agreement nor under any of the other Loan Documents;

(b)     The Financial Statements shall have been furnished and shall be, as of the date thereof, true and correct, and all other financial information required by Lender shall have been furnished and shall be, as of the date of the requested advance, true and correct;

(c)     The financial condition of Borrower and each of its Subsidiaries, as shown by the most recent Financial Statement described in Section 5.01(b) hereof, shall be acceptable to Lender, in its sole discretion; and

(d)     The representations and warranties set forth herein are true and correct in all material respects.

**Section 8.15      No Litigation**.  No action, proceeding, investigation, regulations or legislation shall have been instituted, threatened or proposed before any court, governmental agency or legislative body to enjoin, restrain or prohibit, or to obtain damages in respect of, or which is related to or arises out of disagreement or the consummation of the transactions contemplated hereby, other than as set forth on Schedule 8.15 attached hereto.

**Section 8.16      Excess Availability Requirement**.   Lender shall have determined that immediately after Lender has made at Closing the initial Advances contemplated hereby and Borrower has paid (or made provisions for payment of) secured loans, capitalized leases, accounts payable over sixty (60) days past due, outstanding checks, and all closing costs incurred in connection with the transactions contemplated hereby, the amount of the Borrowing Base shall exceed the aggregate principal amount of all outstanding Advances by $2,300,000.00.

**Section 8.17      Background Check**.  Lender shall have completed a background check with respect to such members of Borrower's management team as Lender shall deem necessary, and the results of which shall be satisfactory to Lender in its sole discretion.

**Section 8.18      Blocked Accounts**.  Borrower shall have established the Blocked Accounts (including lockboxes) required by Section 2.11 hereof pursuant to executed blocked account and lockbox agreements in form and substance satisfactory to Lender, in its sole discretion.

**Section 8.19      Payoff Letter.**  Borrower shall have delivered, or caused to be delivered, to Lender, in form and substance satisfactory to Lender, payoff letters corresponding to the following Indebtedness of Borrower (i) Wells Fargo Line; (ii) Wells Fargo Real Estate Loan; (iii) Wells Fargo Equipment Loan; (iv) Wells Fargo Swap; and (v) Zions Bank, together with such UCC termination statements for each of the foregoing as shall be requested by Lender.

**Section 8.20      Insurance**.  Lender shall have received evidence of insurance (including but not limited to a Lender's ALTA policy) and loss payee or additional insured, as applicable, endorsements required hereunder and under the other Security Agreements, in form and substance satisfactory to Lender, and certificates of insurance policies and/or endorsements naming Lender as loss payee or additional insured, as its interest may appear, as applicable.

**Section 8.21      Subordination Agreements.**  Subject to Section 5.13, the Subordinated Lenders will enter into Subordination Agreements with Lender.

**Section 8.22      Tax Information Authorization**.  Borrower shall have delivered to Lender a duly signed and filed United States Department of the Treasury, Internal Revenue Service Form 8821, which form shall be satisfactory to Lender in its sole discretion.

**Section 8.23      Other Loan Documents and Real Estate Matters**.  Borrower shall have duly and validly executed and delivered, or caused to be executed and delivered, to Lender the following instruments, each in form and substance satisfactory to Lender, in sufficient executed counterparts for recording purposes, as security for the Obligations and shall have delivered the following documents containing information necessary to the preparation and perfection of the liens created by such instruments:

        a.   Financing statements relating to the Collateral;

        b.   Brookshire Deed of Trust.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.01**   **Notices**.  All communications under or in connection with this Agreement shall be in writing and shall be mailed by registered or certified mail, return receipt requested, postage prepaid, or personally delivered to an officer of the receiving party.  All such communications shall be mailed or delivered as follows:

| | | |
|---|---|---|
| (a) | If to Borrower: | Forge USA<br>8881 Hempstead Rd.<br>Houston, TX  77008<br>Attn:  Wade Brougher |
| | with a copy to: | Paul Hastings<br>600 Travis St.<br>Fifty-Eighth Floor<br>Houston, TX  77002<br>Attn:  Steve Tredennick |
| (b) | If to Lender: | TBK Bank, SSB<br>3 Park Central<br>Suite 1700<br>12700 Park Central Drive<br>Dallas, Texas  75251<br>Attn:  James B. Allin |
| | with a copy to: | Schiff Hardin LLP<br>300 Crescent Court, Suite 400<br>Dallas, Texas  75201<br>Attn:  Larry A. Makel, Esq. |

Any notice so addressed and mailed by registered or certified mail, return receipt requested, shall be deemed to be given to Borrower when so mailed and to Lender upon actual receipt by an authorized officer of Lender, and any notice so delivered in person shall be deemed to be given when actually received by, or receipt therefor is given by, an authorized officer of Borrower or Lender, as the case may be.

**Section 9.02**   **Deviation from Covenants**.  The procedure to be followed by Borrower to obtain the consent of Lender to any deviation from the covenants contained in this Agreement or any other Loan Document shall be as follows:

        (a)    Borrower shall send a written notice to Lender setting forth (i) the covenant(s) relevant to the matter, (ii) the requested deviation from the covenant(s) involved, and (iii) the reason for the requested deviation from the covenant(s); and

(b)      Lender will within a reasonable time send a written notice to Borrower, signed by an authorized officer of Lender, permitting or refusing the request; but in no event will any deviation from the covenants of this Agreement or any other Loan Document be effective without the written consent of Lender.

Section 9.03      **Invalidity**.  In the event that any one or more of the provisions contained in this Agreement or in any other Loan Document shall, for any reason, be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other Loan Document.

Section 9.04      **Survival of Agreements**.  All representations and warranties of Borrower herein, and all covenants and agreements herein not fully performed before the effective date of this Agreement, shall survive such date.

Section 9.05      **Successors and Assigns**.  All covenants and agreements contained by or on behalf of Borrower or any Loan Party in this Agreement and any other Loan Document shall bind its successors and assigns and shall inure to the benefit of Lender and its successors and assigns.  So long as no Default or Event of Default has occurred and is continuing, with the consent of the Borrower (which shall not be unreasonably withheld, delayed or conditioned; and provided that no such consent shall be required for an assignment to an Affiliate or branch of Lender), Lender may sell or assign any and all right, title and interest it has in the Collateral, the participations in the Revolving Credit Facility, Term Loan or other Obligations and/or arising under this Agreement.  Borrower shall, upon the direction of Lender: (a) execute all documents reasonably necessary to effectuate such assignment and, (b) pay directly and promptly to Lender's assignee without abatement, deduction or set-off, all amounts which have become due under the assigned agreements.  Lender's assignee shall have any and all rights, immunities and discretion of Lender hereunder and shall be entitled to exercise any remedies of Lender hereunder.  All references herein to Lender shall include Lender's assignee (except that, unless Lender assigns all of its right, title and interests hereunder and under the other Loan Documents (in which case said assignee shall assume in writing all of the obligations and liabilities of Lender hereunder), said assignee shall not be chargeable with any obligations or liabilities hereunder or in respect hereof).  Borrower shall not assert against Lender's assignee any defense, counterclaim or set-off which borrower may have against Lender.  Borrower shall not assign or in any way dispose of all or any of its rights or obligations under this Agreement or any other Loan Document or enter into any agreement regarding all or any part of the Collateral without the prior written consent of Lender (except as expressly permitted under Section 6.05). In connection with the granting of such consent and the preparation of necessary documentation, a fee, determined by Lender in its reasonable discretion, may be assessed.  In the event that Lender has consented to any lease of the Collateral, Borrower hereby assigns and grants to Lender a security interest in any and all rights under any lease(s), to secure all Obligations to Lender.  Time is of the essence with respect to the performance of Borrower's obligations under this Agreement and the other Loan Documents.

Section 9.06      **Renewal, Extension or Rearrangement**.  All provisions of this Agreement relating to the Revolving Credit Facility, Term Loan, or other Obligations shall apply with equal force and effect to each and all documents and instruments hereinafter executed which in whole or in part represent a renewal, extension, increase or rearrangement of any part of the Obligations originally represented by the Revolving Credit Facility or Term Loan described herein or of any part of such other Obligations.  Any provision of this Agreement to be performed during the "term of this Agreement," "term hereof" or similar language, shall include any extension period.  Upon (x) the occurrence of the Termination Date, with respect to the Collateral and (y) the date any Collateral is disposed of in accordance with this Agreement, Lender agrees to execute and deliver (at Borrower's expense) all

documents, instruments or other recordings reasonably requested by Borrower to effectuate or evidence such termination and release.

Section 9.07    **Amendment and Waiver**.  No waiver or modification of any of the terms or provisions of this Agreement shall be valid or binding unless set forth in a writing signed by a duly authorized officer of Lender and Borrower, and then only to the extent specifically set forth therein.  The waiver by Lender of any Default or Event of Default hereunder or of any provisions hereof shall not discharge any party hereto from liability hereunder and such waiver shall be limited to the particular Default or Event of Default and shall not operate as a waiver of any other or subsequent Default or Event of Default. No failure or delay on the part of Lender to exercise any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy.  The provisions of this Agreement and the rights and remedies granted to Lender herein shall be in addition to, and not in limitation of those of any other agreement with Lender or any other evidence of any liability held by Lender.

Section 9.08    **Cumulative Rights**.  Rights and remedies of Lender under this Agreement and each other Loan Document shall be cumulative, and the exercise or partial exercise of any such right or remedy shall not preclude the exercise of any other right or remedy.

Section 9.09    **Construction**.  This Agreement is a contract made under and shall be construed in accordance with and governed by the laws of the State of Texas.

Section 9.10    **Interest**.  It is the intention of the parties hereto to conform strictly to applicable usury laws now in force. Accordingly, if the transactions contemplated hereby would be usurious under applicable law, then, in that event, notwithstanding anything to the contrary in this Agreement or in any other Loan Document or agreement entered into in connection with or as security for the Revolving Credit Facility or Term Loan, it is agreed as follows: (a) the aggregate of all consideration which constitutes interest under applicable law that is contracted for, charged or received under the Revolving Credit Facility or Term Loan, this Agreement or under any of the other aforesaid Loan Documents or agreements or otherwise in connection with the Revolving Credit Facility and/or the Term Loan shall under no circumstances exceed the maximum amount of interest permitted by applicable law, and any excess shall be credited to the Term Loan (or, (x) if the Term Loan has been paid in full, to the Revolving Credit Facility, or (y) if the Revolving Credit Facility shall have been paid in full, then, refunded to Borrower); (b) determination of the rate of interest for determining whether the loans hereunder are usurious shall be made by amortizing, prorating, allocating and spreading, during the full stated term of such loans, all interest at any time contracted for, charged or received from Borrower in connection with such loans, and any excess shall be canceled, credited or refunded as set forth in clause (a) herein; and (c) in the event that the maturity of the Revolving Credit Facility and the Term Loan are accelerated by reason of an election of the holder thereof resulting from any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest may never include more than the maximum amount permitted by applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited on the Term Loan (or, (x) if the Term Loan shall have been paid in full, then to the Revolving Credit Facility, or (y) if the Revolving Credit Facility shall have been paid in full, then refunded to Borrower).

Section 9.11    **Multiple Originals**.  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument.  Delivery of an executed counterpart by electronic transmission shall be effective as

41

delivery of a manually executed counterpart, and any party delivering such an executed counterpart shall thereafter also promptly deliver a manually executed counterpart, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this Agreement.

Section 9.12 **Exhibits and Schedules**.  All exhibits and schedules to this Agreement are incorporated herein by this reference for all purposes.  The exhibits and schedules may be attached hereto, or bound together with or separately from this Agreement, and such binding shall be effective to identify such exhibits as if attached to this Agreement.

Section 9.13 **No Triparty Loan**.  Texas Revised Civil Statutes Annotated, Finance Code, Chapter 346 (which regulates certain revolving loan accounts and revolving triparty accounts) shall not apply to the loans evidenced by this Agreement.

Section 9.14 **Applicable Rate Ceiling**.  Unless changed in accordance with law, the applicable rate ceiling under Texas law shall be the indicated (weekly) rate ceiling from time to time in effect as provided in Texas Revised Civil Statutes Annotated, Finance Code, Chapter 303, as amended.

Section 9.15 **Choice of Law, Venue and Jurisdiction**.  This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the State of Texas.  Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if Lender so elects, be instituted in any court sitting in Dallas County, Texas or, if none, any court sitting in the State of Texas (the "Acceptable Forums").  Borrower agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue.  Should such proceeding be initiated in any other forum, Borrower waives any right to oppose any motion or application made by Lender to transfer such proceeding to an Acceptable Forum.

Section 9.16 **Negotiation of Documents**.  This Agreement and all other Loan Documents have been negotiated by the parties at arm's length, each represented by its own counsel, and the fact that the documents have been prepared by Lender's counsel, after such negotiation, shall not be cause to construe any of such documents against Lender.

Section 9.17 **Notices Received by Lender**.  Any instrument in writing, telex, telegram, telecopy or cable received by Lender in connection with any loan hereunder, which purports to be dispatched or signed by or on behalf of Borrower, shall conclusively be deemed to have been signed by such party, and Lender may rely thereon and shall have no obligation, duty or responsibility to determine the validity or genuineness thereof or authority of the Person or Persons executing or dispatching the same.

Section 9.18 **Debtor-Creditor Relationship**.  None of the terms of this Agreement or of any other document executed in conjunction herewith or related hereto shall be deemed to give Lender the rights or powers to exercise control over the business or affairs of Borrower.  The relationship between Borrower and Lender created by this Agreement is only that of debtor/creditor.

Section 9.19 **No Third-Party Beneficiaries**.  This Agreement is for the sole and exclusive benefit of Borrower and Lender.  This Agreement does not create, and is not intended to create, any rights in favor of or enforceable by any other Person.  This Agreement may be amended or modified by the agreement of Borrower and Lender, without any requirement or necessity for notice to, or the consent of or approval of any other Person.

**Exhibit "A"**

**Section 9.20      Indemnification**.  BORROWER AGREES TO DEFEND, INDEMNIFY AND HOLD HARMLESS LENDER AND ITS AFFILIATES AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ATTORNEYS AND ADVISORS (EACH, AND "INDEMNIFIED PARTY") FROM AND AGAINST ANY AND ALL CLAIMS, DAMAGES, LOSSES, LIABILITIES, COSTS AND EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND EXPENSES (LIMITED TO ONE COUNSEL TO ALL INDEMNIFIED PARTIES, TAKEN TOGETHER, IN EACH RELEVANT JURISDICTION)) THAT MAY BE INCURRED BY OR ASSERTED OR AWARDED AGAINST ANY INDEMNIFIED PARTY, IN EACH CASE ARISING OUT OF OR IN CONNECTION WITH (INCLUDING, WITHOUT LIMITATION, IN CONNECTION WITH ANY INVESTIGATION, LITIGATION OR PROCEEDING OR PREPARATION OF DEFENSE IN CONNECTION THEREWITH) THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY OTHER INSTRUMENT OR AGREEMENT EXECUTED IN CONNECTION THEREWITH OR HEREWITH, ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN OR HEREIN OR THE ACTUAL OR PROPOSED USE OF THE PROCEEDS OF THE LOANS (INCLUDING ANY OF THE FOREGOING ARISING FROM THE NEGLIGENCE OF THE INDEMNIFIED PARTY), EXCEPT TO THE EXTENT SUCH CLAIM, DAMAGE, LOSS, LIABILITY, COST OR EXPENSES IS FOUND IN A FINAL, NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH INDEMNIFIED PARTY'S GROSS NEGLIGENCE OR WILFUL MISCONDUCT, IN THE CASE OF AN INVESTIGATION, LITIGATION OR OTHER PROCEEDING TO WHICH THE INDEMNITY IN THIS SECTION 9.20 APPLIES, SUCH INDEMNITY SHALL BE EFFECTIVE REGARDLESS OF WHETHER SUCH INVESTIGATION, LITIGATION OR PROCEEDING IS BROUGHT BY BORROWER OR ITS RESPECTIVE DIRECTORS, SHAREHOLDERS OR CREDITORS OR AN INDEMNIFIED PARTY IS OTHERWISE A PARTY THERETO AND WHETHER THE TRANSACTIONS CONTEMPLATED HEREBY ARE CONSUMMATED, WITHOUT PREJUDICE TO THE SURVIVAL OF ANY OTHER AGREEMENT OF BORROWER HEREUNDER, THE AGREEMENTS AND OBLIGATIONS OF BORROWER CONTAINED IN THIS SECTION 9.20 SHALL SURVIVE THE PAYMENT IN FULL OF THE INDEBTEDNESS AND ALL OTHER AMOUNTS PAYABLE UNDER THIS AGREEMENT.

**Section 9.21      Release Of Liability.**  TO THE MAXIMUM EXTENT PERMITTED BY LAW FROM TIME TO TIME IN EFFECT, BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY (AND AFTER IT HAS CONSULTED WITH ITS OWN ATTORNEY) IRREVOCABLY AND UNCONDITIONALLY AGREES THAT NO CLAIM MAY BE MADE BY BORROWER AGAINST LENDER OR ANY OF ITS AFFILIATES, PARTICIPANTS, SHAREHOLDERS, DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS, ACCOUNTANTS, OR AGENTS OR ANY OF ITS OR THEIR SUCCESSORS AND ASSIGNS, FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES IN RESPECT OF ANY BREACH OR WRONGFUL CONDUCT (WHETHER THE CLAIM IS BASED ON CONTRACT, TORT OR STATUTE) ARISING OUT OF, OR RELATED TO, THE TRANSACTIONS CONTEMPLATED BY ANY OF THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR ANY OTHER RELATED DOCUMENTS, OR ANY ACT, OMISSION, OR EVENT OCCURRING IN CONNECTION HEREWITH OR THEREWITH.  IN FURTHERANCE OF THE FOREGOING, BORROWER HEREBY WAIVES, RELEASES AND AGREES NOT TO SUE UPON ANY CLAIM FOR ANY SUCH DAMAGES, WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN ITS FAVOR, AND BORROWER SHALL INDEMNIFY AND HOLD HARMLESS LENDER AND ITS AFFILIATES, PARTICIPANTS, SHAREHOLDERS, DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS, ACCOUNTANTS AND AGENTS AND THEIR SUCCESSORS AND ASSIGNS OF AND FROM ANY SUCH CLAIMS.

43

Section 9.22    WAIVER OF TRIAL BY JURY.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (a) ARISING UNDER THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (b) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO.  IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE, EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTIONS SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 9.22 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

Section 9.23    DTPA Waiver.  Borrower acknowledges and agrees, on Borrower's own behalf of any permitted assigns and successors hereafter, that the DTPA is not applicable to this transaction.  Accordingly, Borrower's rights and remedies with respect to the transaction contemplated under this Agreement and with respect to all acts or practices of Lender, past, present or future, in connection with such transaction, shall be governed by legal principles other than the DTPA.  In furtherance thereof, Borrower agrees as follows:

(a)    Borrower represents that Borrower has the knowledge and experience in financial and business matters that enable Borrower to evaluate the merits and risks of the business transaction that is the subject of this Agreement.  Borrower also represents that Borrower is not in a significantly disparate bargaining position in relation to Lender.  Borrower has negotiated the Loan Documents with Lender at arm's length and have willingly entered into the Loan Documents.

(b)    Borrower represents that (i) Borrower has been represented by the firm of Paul Hastings, LLP, as legal counsel in the transaction contemplated by this Agreement and (ii) such legal counsel was not directly or indirectly identified, suggested or selected by Lender or an agent of Lender.

(c)    This Agreement relates to a transaction involving total consideration by Borrower of more than $100,000.00 and does not involve Borrower's residence.

Borrower agrees, on Borrower's own behalf and on behalf of Borrower's permitted assigns and successors, that all of Borrower's rights and remedies under the DTPA are WAIVED AND RELEASED, including specifically, without limitation, all rights and remedies under the DTPA resulting from or arising out of any and all acts or practices of Lender in connection with this transaction, whether such acts or practices occur before or after the execution of this Agreement.

In furtherance thereof, Borrower agrees that by signing this Agreement, Borrower and any permitted assigns and successors are bound by the following waiver:

WAIVER OF CONSUMER RIGHTS.  BORROWER HEREBY WAIVES ITS RIGHTS UNDER THE DECEPTIVE

44

Exhibit "A"

TRADE PRACTICES - CONSUMER PROTECTION ACT, SECTION 17.41 ET. SEQ. BUSINESS & COMMERCE CODE, A LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS.   AFTER CONSULTATION WITH AN ATTORNEY OF BORROWER'S OWN SELECTION, BORROWER VOLUNTARILY CONSENTS TO THIS WAIVER.

**BORROWER HAS READ AND UNDERSTANDS <u>SECTION 9.23</u> HEREOF:**
**[_____] (INITIALS) (BORROWER)**

Section 9.24    **Final Expression.  THIS WRITTEN LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS EMBODIES THE ENTIRE AGREEMENT BETWEEN THE PARTIES AND SUPERSEDES ALL PRIOR AGREEMENTS AND UNDERSTANDINGS RELATING TO THE SAME SUBJECT MATTER THEREIN. THERE ARE NO ORAL AGREEMENTS BETWEEN THE PARTIES.   BORROWER ACKNOWLEDGES THAT NO PROMISES OF ANY KIND HAVE BEEN MADE BY LENDER OR ANY THIRD PARTY TO INDUCE BORROWER TO EXECUTE THIS WRITTEN LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS EXCEPT TO THE EXTENT EXPRESSLY CONTAINED HEREIN OR THEREIN. UPON REQUEST, THE PARTIES WILL PROMPTLY EXECUTE AND DELIVER SUCH OTHER AND FURTHER DOCUMENTS AND INSTRUMENTS, AND SHALL DO OR TAKE SUCH OTHER ACTIONS AS MAY BE REASONABLY REQUIRED OR APPROPRIATE, TO CURE ANY DEFECTS IN THE CREATION AND ISSUANCE OF THIS WRITTEN LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS OR IN THE PERFECTION OF PRESERVATION OF THE SECURITY INTERESTS CONTEMPLATED HEREIN OR THEREIN.**

Section 9.25    **Reversal of Payments**.  Lender shall have the continuing and exclusive right to apply, reverse and re-apply any and all payments to any portion of the Obligations in a manner consistent with the terms of this Agreement.  To the extent Borrower makes a payment or payments to Lender, or Lender receives any payment or proceeds of any collateral for Borrower's benefit, which payment(s) or proceed or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other part under any bankruptcy law, state or federal  law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Obligations or party thereof intended to be satisfied shall be revived and continued in full force and effect, as if such payment or proceeds had not been received by Lender.

Section 9.26    **Injunctive Relief**.  Borrower recognizes that, in the event Borrower fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, any remedy at law may prove to be inadequate relief to Lender, therefore, Borrower agrees that if any Default or Event of Default shall have occurred and be continuing, Lender shall be entitled to temporary and permanent injunctive relief without the necessity of proving actual damages.

Section 9.27    **Confidentiality**.  Lender agrees to keep confidential all non-public information provided to it by any Loan Party pursuant to this Agreement or any other Loan Document; provided that nothing herein shall prevent Lender from disclosing any such information (a) to any Affiliate of Lender (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such information confidential), (b) to its employees, directors, members, partners, agents, attorneys, accountants and other professional advisors or those of any of its Affiliates (it being understood that the Person to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such information

45

Exhibit "A"

present or future, in connection with such transaction, shall be governed by legal principles other than the DTPA. In furtherance thereof, Borrower agrees as follows:

    (a)    Borrower represents that Borrower has the knowledge and experience in financial and business matters that enable Borrower to evaluate the merits and risks of the business transaction that is the subject of this Agreement. Borrower also represents that Borrower is not in a significantly disparate bargaining position in relation to Lender. Borrower has negotiated the Loan Documents with Lender at arm's length and have willingly entered into the Loan Documents.

    (b)    Borrower represents that (i) Borrower has been represented by the firm of Paul Hastings, LLP, as legal counsel in the transaction contemplated by this Agreement and (ii) such legal counsel was not directly or indirectly identified, suggested or selected by Lender or an agent of Lender.

    (c)    This Agreement relates to a transaction involving total consideration by Borrower of more than $100,000.00 and does not involve Borrower's residence.

Borrower agrees, on Borrower's own behalf and on behalf of Borrower's permitted assigns and successors, that all of Borrower's rights and remedies under the DTPA are WAIVED AND RELEASED, including specifically, without limitation, all rights and remedies under the DTPA resulting from or arising out of any and all acts or practices of Lender in connection with this transaction, whether such acts or practices occur before or after the execution of this Agreement.

In furtherance thereof, Borrower agrees that by signing this Agreement, Borrower and any permitted assigns and successors are bound by the following waiver:

    WAIVER OF CONSUMER RIGHTS. BORROWER HEREBY WAIVES ITS RIGHTS UNDER THE DECEPTIVE TRADE PRACTICES - CONSUMER PROTECTION ACT, SECTION 17.41 ET. SEQ. BUSINESS & COMMERCE CODE, A LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS. AFTER CONSULTATION WITH AN ATTORNEY OF BORROWER'S OWN SELECTION, BORROWER VOLUNTARILY CONSENTS TO THIS WAIVER.

BORROWER HAS READ AND UNDERSTANDS <u>SECTION 9.23</u> HEREOF:
[     ] (INITIALS) (BORROWER)

    Section 9.24    <u>Final Expression.</u> <u>THIS WRITTEN LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS EMBODIES THE ENTIRE AGREEMENT BETWEEN THE PARTIES AND SUPERSEDES ALL PRIOR AGREEMENTS AND UNDERSTANDINGS RELATING TO THE SAME SUBJECT MATTER THEREIN. THERE ARE NO ORAL AGREEMENTS BETWEEN THE PARTIES. BORROWER ACKNOWLEDGES THAT NO PROMISES OF ANY KIND HAVE BEEN MADE BY LENDER OR ANY THIRD PARTY TO INDUCE BORROWER TO EXECUTE THIS WRITTEN LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS EXCEPT TO THE EXTENT EXPRESSLY CONTAINED HEREIN OR THEREIN. UPON REQUEST, THE PARTIES WILL PROMPTLY EXECUTE AND DELIVER SUCH OTHER AND FURTHER DOCUMENTS AND INSTRUMENTS, AND SHALL DO OR TAKE SUCH OTHER ACTIONS AS MAY BE REASONABLY REQUIRED OR</u>

[Brougher] Loan Agreement

confidential), (c) upon the request or demand of any governmental authority having jurisdiction over it, (d) in response to any order of any court or other governmental authority or as may otherwise be required pursuant to any requirement of law, (e) that has been publicly disclosed (other than as a result of a disclosure in violation of this Section 9.27) or becomes available to Lender on a non-confidential basis from a source other than any Loan Party or any Subsidiary thereof, (f) in connection with the exercise of any remedy or the enforcement of any right under this Agreement or any other Loan Document or (g) in connection with the sale or participation of the Term Loan or Advances hereunder.

*[remainder of page intentionally left blank; signature pages follow]*

[Brougher] Loan Agreement
46475-0047
DA\400319979.12

Exhibit "A"

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be duly executed as of the date first above written.

**BORROWER**:

BROUGHER, INC.,
a Texas corporation

By: _____
Name:  Wade Brougher
Title:  President

**LENDER:**

TBK BANK, SSB,

By: _____
Name: James B. Allin
Title: Senior Vice President

Signature Page to Loan Agreement

Exhibit "A"

**Schedule 2.10**
**Operating Accounts**

| Bank | Address | Account | Number |
|---|---|---|---|
| Wells Fargo | 299 S. Main Street, 6th Floor<br>Salt Lake City, UT 84111<br>Attn: Greg Mondon | Commercial Checking Account (ZBA) | 9617999967 |
| Wells Fargo | 299 S. Main Street, 6th Floor<br>Salt Lake City, UT 84111<br>Attn: Greg Mondon | Operating Account (Lockbox Deposit) | 4128320199 |
| TBK Bank, SSB | 5210 Jersey Ridge Rd.<br>Davenport, IA 52807<br>Attn: Marty Ganz | Deposit Account | 4498028 |

Exhibit "A"

**Schedule 2.11**
**Blocked Accounts**

| Bank | Address | Account | Number |
|---|---|---|---|
| **TBK Bank, SSB** | 5210 Jersey Ridge Rd., Davenport, IA 52807 <u>Attn</u>: Marty Ganz | Restricted Account | 4498069 |

**Schedule 4.01**
**Corporate Existence**

(i)  Trade Names:

  1.  Forge USA

(ii)  Mergers and Acquisitions:

  1.  Merger by Machine USA, LLC with and into Borrower, effective December 31, 2012

Office Address:

  2525 North Loop West, Suite 510, Houston, TX 77008

Operations Sites:

  1.  8881 Hempstead Highway, Houston, TX 77008

  2.  34218 Sunset Ln. Brookshire, TX 77423

**Schedule 4.06**
**Stock of Borrower**

| Owner Name | Percent Ownership | Type and Number of Shares |
|---|---|---|
| Brougher Holdings, LLC | 100% | 100 common shares |

**<u>Schedule 4.14</u>**
**Subsidiaries**

None.

## Schedule 4.17
### Leases

1.  Lease Agreement, dated December 5, 2014, by and between Lykes Building Holdings Associates, Smetana Texas Realty Associates, c/o Associated Houston Management, LLC and Brougher, Inc. d/b/a Forge USA, as amended by that certain First Amendment to Lease Agreement dated January 1, 2016.

2.  Facilities Net Lease, dated March 1, 2016, by and between Blake Partners, L.P. and Brougher, Inc. d/b/a Forger USA.

3.  Lease No. 001-7347067-050, dated January 16, 2015, by and between Dell Financial Services L.L.C. and Brougher, Inc.

4.  Lease No. 001-007347067-049, dated April 13, 2013, by and between Dell Financial Services L.L.C. and Brougher, Inc.

5.  Motor Vehicle Lease Agreement with Arbitration Clause, dated March 6, 2013, by and between West Houston Infiniti, Ltd. and Brougher, Inc. d/b/a Forge USA.

6.  Equipment Lease Agreement, dated May 19, 2015, by and between Brougher, Inc and De Landen Financial Services, Inc.

7.  Motor Vehicle Lease Agreement, dated July 21, 2014, by and between Mercedes-Benz of Sugar Land and Forge USA.

**<u>Schedule 4.18</u>**
**Patents, Trademarks, Copyrights and Licenses**

Trademarks:

    1.       FORGE USA, serial number 78456443, filed July 26, 2004

**Schedule 6.02**
**Liens**

| | Debtors | Secured Parties | Filing Number | Date Filed | Collateral |
|---|---|---|---|---|---|
| 1. | BROUGHER, INC. | U.S. BANK EQUIPMENT FINANCE | 120008858830 | 03/21/2012 | Xerox copier, model #7775 |
| 2. | BROUGHER, INC. | U.S. BANK EQUIPMENT FINANCE | 120010849873 | 04/06/2012 | Xerox copier, model #X640X |
| 3. | BROUGHER, INC. | THIRD COAST BANK SSB | 130004072512 | 02/06/2013 | Honing Machine |
| 4. | BROUGHER, INC. | DELL FINANCIAL SERVICES L.L.C. | 130012000522 | 04/16/2013 | EqualLogic PS6100XV, 600GB |
| 5. | BROUGHER, INC. | DELL FINANCIAL SERVICES L.L.C. | 150001791236 | 01/20/2015 | EqualLogic PS6100XV, 600GB |
| 6. | BROUGHER, INC. | DE LAGE LANDEN FINANCIAL SERVICES, INC. | 150024248359 | 07/29/2015 | Forklift rental |

Exhibit "A"

**Schedule 8.15**
**Litigation**

1.     Mark Miller v. Brougher, Inc. d/b/a Forger USA, Cause No. 201572804, 80th Judicial District Court, Harris County, Texas.


Mark Miller was the former chief operating officer of Forge USA. Mr. Miller has sued for a $75,000 bonus payment and certain severance payments that Forge believes are not owed and Forge has initiated the process of defending the lawsuit.  While still early in the process, Forge does not think Mr. Miller's claims have any merit.